Opinion by Judge REINHARDT; Partial Concurrence and Partial Dissent by Judge WARDLAW.
OPINION
REINHARDT, Circuit Judge:
The election of our first black President produced a campaign with vitriolic personal attacks and, ultimately, sentiments of national pride and good will. The latter was short-lived on the part of some, politicians and non-politicians alike, and the vi *1114 triol continued as President Obama’s term of office commenced. To those familiar with American political history, none of this should.have come as a surprise. Although Justice Scalia writes that “[o]bservers of the past few national elections have expressed concern about the increase of character assassination ... engaged in by political candidates and their supporters,”[1] mudslinging has long been a staple of U.S. presidential elections. Justice Scalia, though analyzing a current issue, uncharacteristically overlooked the experience of our Founding Fathers. In the country’s first contested presidential election of 1800, supporters of Thomas Jefferson claimed that incumbent John Adams wanted to marry off his son to the daughter of King George III to create an American dynasty under British rule; Adams supporters called Jefferson “a mean-spirited, low-lived fellow, the son of a half-breed Indian squaw, sired by a Virginia mulatto father.”[2] Abraham Lincoln was derided as an ape, ghoul, lunatic, and savage,[3] while Andrew Jackson was accused of adultery and murder,[4] and opponents of Grover Cleveland chanted slogans that he had fathered a child out-of-wedlock.[5] Still, the 2008 presidential election was unique in the combination of racial, religious, and ethnic bias that contributed to the extreme enmity expressed at various points during the campaign.[6] Much of this bias was misinformed because although the presidential candidate was indeed black, he was neither, as some insisted, Muslim nor foreign born.[7]
*1115 Here, we review a district court’s conviction under 18 U.S.C. § 879(a)(3), which makes it a felony to threaten to kill or do bodily harm to a major presidential candidate. The defendant Walter Bagdasarian, an especially unpleasant fellow, was found guilty on two counts of making the following statements on an online message board two weeks before the presidential election: (1) “Re: Obama fk the niggar, he will have a 50 cal in the head soon” and (2) “shoot the nig.”[8] These statements are particularly repugnant because they directly encourage violence.[9] We nevertheless hold that neither of them constitutes an offense within the meaning of the threat statute under which Bagdasarian was convicted.
I. Background
On October 22, 2008, when Barack Obama’s election was looking more and more likely, Bagdasarian, under the username “californiaradial,” joined a “Yahoo! Finance — American International Group” message board, on which members of the public posted messages concerning financial matters, AIG, and other topics. At 1:15 am on the day that he joined, Bagdasarian posted the following statement on the message board: “Re: Obama fk the niggar, he will have a 50 cal in the head soon.” About twenty minutes later, he posted another statement on the same message board: “shoot the nig country fkd for another 4 years+ , what nig has done ANYTHING right???? long term???? never in history, except sambos.” Bagdasarian also posted statements on the same message board that he had been extremely intoxicated at the time that he made the two earlier statements.[10] He repeated at trial that he had been drinking heavily on October 22. Another participant on the message board, John Base, a retired Air Force officer, reported Bagdasarian’s second statement regarding Obama to the Los Angeles Field Office of the United States Secret Service that same morning. Base told the Secret Service that an individual identified by the username “californiaradial” had made alarming statements directed at the presidential candidate. He also provided the Secret Service with the Internet address link to the “shoot the nig” message board posting.
A Secret Service agent located this posting and the “Obama fk the niggar” posting on the Yahoo! message board, and, a week later, Yahoo! provided the Secret Service with subscriber information for california radial@yahoo.com, registered in La Mesa, California. Yahoo! also provided the Secret Service with the Internet Protocol history for the “californiaradial” email account, which Service agents used to identify the IP address from which the “shoot *1116 the nig” and “Obama fk the niggar” statements were posted. This IP address led the Service agents to Bagdasarian’s home in La Mesa.
A month after the two statements for which Bagdasarian was indicted were posted on the AIG message board, two agents visited and interviewed him and he admitted to posting the statements from his home computer. When asked, he also told the agents that he had weapons in his home. The agents found one weapon on a nearby shelf; Bagdasarian said he had other weapons in addition. Four days later, agents executed a federal search warrant at Bagdasarian’s home and found six firearms, including a Remington model 700ML .50 caliber muzzle-loading rifle, as well as .50 caliber ammunition.
The agents also searched the hard drive of Bagdasarian’s home computer and recovered an email sent on Election Day with the subject, “Re: And so it begins.” The email’s text stated, “Pistol? ? ? Dude, Josh needs to get us one of these, just shoot the nigga’s ear and POOF!” The email provided a link to a webpage advertising a large caliber rifle. Another email that Bagdasarian sent the same day with the same subject heading stated, “Pistol ... plink plink plink Now when you use a 50 cal on a nigga car you get this.” It included a link to a video of a propane tank, a pile of debris, and two junked cars being blown up. These email messages would appear to confirm the malevolent nature of the previous statements as well as Bagdasarian’s own malignant nature. Unlike in the case of his first two message board statements two weeks earlier, this time he did not attempt to excuse his inexcusable conduct on the ground that he was intoxicated.
After the Secret Service filed a criminal complaint against Bagdasarian for the posting the “shoot the nig” and “Obama fk the niggar” statements, the Government filed the superseding indictment at issue here, charging Bagdasarian in two counts under 18 U.S.C. § 879(a)(3) with threatening to kill and inflict bodily harm upon a major candidate for the office of president of the United States. Bagdasarian waived his right to a jury trial. His case was tried before a district judge upon the foregoing stipulated facts. The district court found Bagdasarian guilty on both counts. He appeals.
II. Analysis
The federal statute under which Bagdasarian was indicted, 18 U.S.C. § 879(a)(3), makes it a crime to “knowingly and willfully threaten[ ] to kill, kidnap, or inflict bodily harm upon ... a major candidate for the office of President or Vice President, or a member of the immediate family of such candidate.” A statute like § 879, “which makes criminal a form of pure speech, must be interpreted with the commands of the First Amendment clearly in mind.” Watts v. United States, 394 U.S. 705, 707, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969). Although the State cannot criminalize constitutionally protected speech, the First Amendment does not immunize “true threats.” Id. at 708, 89 S.Ct. 1399. The Court held in Virginia v. Black, 538 U.S. 343, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003), that under the First Amendment the State can punish threatening expression, but only if the “speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals.” Id. at 359, 123 S.Ct. 1536. It is therefore not sufficient that objective observers would reasonably perceive such speech as a threat of injury or death.
Because of comments made in some of our cases, we begin by clearing up the perceived confusion as to whether a subjective or objective analysis is required when examining whether a threat is criminal under various threat statutes and the *1117 First Amendment.[11] Such a choice reflects a false dichotomy. The issue is actually whether, as to a threat prosecuted under a particular threat statute, only a subjective analysis need be applied or whether both a subjective and an objective analysis is required. Whether we have held that a threat under a particular statute must be examined under an objective standard, as with 18 U.S.C. § 871(a),[12] which makes it unlawful to threaten the President, or whether we have held that the statute requires the application of both an objective and subjective standard, as with 18 U.S.C. § 879(a)(3),[13] the provision that we consider here, our analysis in its most important respect is ultimately the same: In order to affirm a conviction under any threat statute that criminalizes pure speech, we must find sufficient evidence that the speech at issue constitutes a “true threat,” as defined in Black. Because the true threat requirement is imposed by the Constitution, the subjective test set forth in Black must be read into all threat statutes that criminalize pure speech. The difference is that with respect to some threat statutes, we require that the purported threat meet an objective standard in addition, and for some we do not.[14]
As we explained in United States v. Cassel, 408 F.3d 622 (9th Cir.2005), al *1118 though the “vagaries of our own case law,” id. at 630, made it less than “entirely clear or consistent,” “whether intent to threaten is a necessary part of a constitutionally punishable threat,” id. at 628, Black “affirmed our own dictum — not always adhered to in our cases — that ‘the element of intent [is] the determinative factor separating protected expression from unprotected criminal behavior.’ ” Id. at 632 (alteration in original) (quoting United States v. Gilbert, 813 F.2d 1523, 1529 (9th Cir.1987)). Cassel made clear that Black’s “definition of a constitutionally proscribable threat is ... binding on us even though it is in tension with some of the holdings and language in prior cases of this circuit.” Id. at 633 (citation omitted).[15]
Because § 879(a)(3), the provision at issue here, requires subjective intent as a matter of statutory construction, see Gordon, 974 F.2d at 1117, it necessarily incorporates the constitutional inquiry commanded by Black: Did the speaker subjectively intend the speech as a threat? In order to “determine whether the verdict [under the statutory elements] is supported by sufficient evidence,” we must answer the question “whether the facts as found by the jury establish the core constitutional fact of a ‘true threat.’ ” Stewart, 420 F.3d at 1015. Our subjective intent analysis under § 879(a)(3) therefore subsumes the subjective intent-based true threat inquiry as described in Black.
A. Elements of the Offense
Two elements must be met for a statement to constitute an offense under 18 U.S.C. § 879(a)(3): objective and subjective. The first is that the statement would be understood by people hearing or reading it in context as a serious expression of an intent to kill or injure a major candidate for President. See Gordon, 974 F.2d at 1117. The second is that the defendant intended that the statement be understood as a threat. Id. Because Bagdasarian’s conviction under § 879 can be upheld only if both the objective and subjective requirements are met, neither standard is the obvious starting point for our analysis, and our resolution of either issue may serve as an alternate holding.[16]
*1119 1. Objective Understanding
We begin with the objective test. One question under § 879(a)(3) is whether a reasonable person who heard the statement would have interpreted it as a threat. Gordon, 974 F.2d at 1117. This objective test requires the fact-finder to “look[] at the entire factual context of [the] statements including: the surrounding events, the listeners’ reaction, and whether the words are conditional.” Id. It is necessary, then, to determine whether Bagdasarian’s statements, considered in their full context, “would be interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily harm on or to take the life of [Obama].” Id. (quoting Roy, 416 F.2d at 877-78). The evidence is not sufficient to support a conclusion that a reasonable person who read the postings within or without the relevant context would have understood either to mean that Bagdasarian threatened to injure or kill the Presidential candidate.[17]
Neither statement constitutes a threat in the ordinary meaning of the word: “an expression of an intention to inflict ... injury ... on another.” Webster’s Third New International Dictionary 2382 (1976). The “Obama fk the niggar” statement is a prediction that Obama “will have a 50 cal in the head soon.” It conveys no explicit or implicit threat on the part of Bagdasarian that he himself will kill or injure Obama. Nor does the second statement impart a threat. “[S]hoot the nig” is instead an imperative intended to encourage others to take violent action, if not simply an expression of rage or frustration. The threat statute, however, does not criminalize predictions or exhortations to others to injure or kill the President.[18] It is difficult to see how a rational trier of fact could reasonably have found that either statement, on its face or taken in context, expresses a threat against Obama by Bagdasarian.[19]
There is no disputing that neither of Bagdasarian’s statements was conditional *1120 and that both were alarming and dangerous. The first statement, which referred to Obama as a “niggar” who “will have a 50 cal in the head soon,” coupled a racial slur with an assassination forecast during a highly controversial campaign that would ultimately make Obama the country’s first black president. No less troubling is the defendant’s second statement imploring others to “shoot the nig,” lest the “country [be] fkd for another 4 years + ” because “never in history” has a black person “done ANYTHING right.” There are many unstable individuals in this nation to whom assault weapons and other firearms are readily available, some of whom might believe that they were doing the nation a service were they to follow Bagdasarian’s commandment. There is nevertheless insufficient evidence that either statement constituted a threat or would be construed by a reasonable person as a genuine threat by Bagdasarian against Obama.
When our law punishes words, we must examine the surrounding circumstances to discern the significance of those words’ utterance, but must not distort or embellish their plain meaning so that the law may reach them. Here, the meaning of the words is absolutely plain. They do not constitute a threat and do not fall within the offense punished by the statute. In Watts, the Supreme Court reversed a conviction under a presidential threat statute. 394 U.S. at 705-06, 89 S.Ct. 1399. The defendant there had said, “[a]nd now I have already received my draft classification as 1-A and I have got to report for my physical this Monday coming. I am not going. If they ever make me carry a rifle the first man I want to get in my sights is L.B.J.” Id. at 706, 89 S.Ct. 1399. The Court held that “we must interpret the language Congress chose ‘against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wideopen, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials’ adding that “[t]he language of the political arena ... is often vituperative, abusive, and inexact.” Id. at 708, 89 S.Ct. 1399 (citations omitted).
The Government argues that among the relevant elements of the factual context is that the defendant’s messages were anonymous, posted only under the screen name “californiaradial.” We grant that in some circumstances a speaker’s anonymity could influence a listener’s perception of danger. But the Government offers no support for its contention that the imperative “shoot the nig” or the prediction that Obama “will have a 50 cal in the head soon” would be more rather than less likely to be regarded as a threat under circumstances in which the speaker’s identity is unknown.[20] *1121 Whatever the effect, in other circumstances, of anonymity on a reasonable interpretation of Bagdasarian’s statements, the financial message board to which he posted them is a non-violent discussion forum that would tend to blunt any perception that statements made there were serious expressions of intended violence.
When, in this case, we look to “[c]ontextual information ... that [could] have a bearing on whether [Bagdasarian’s] statements might reasonably be interpreted as a threat,” United States v. Parr, 545 F.3d 491, 502 (7th Cir.2008), cert, denied, — U.S. -, 129 S.Ct. 1984, 173 L.Ed.2d 1083 (2009), the only possible evidence is that three or four discussion board members wrote that they planned to alert authorities to the “shoot the nig” posting, although only one reader, Air Force Officer Base, actually did. The dissent identifies the responsive postings as the “[m]ost telling” evidence that a reasonable person would have perceived Bagdasarian’s messages as a threat. In doing so, it mischaracterizes these postings as “indicat[ing] that [their authors] perceived ‘shoot the nig’ as a threat to candidate Obama.” Dissent at 1129. In fact, none of the responses said anything about a threat. Their authors may well have thought that Bagdasarian’s messages were impermissible or offensive for some other reason or that they encouraged racism or violence. We fail to see why the fact that several people had negative reactions to the messages should be taken to mean that they or others interpreted them as a threat. It is certainly more significant that among the numerous persons who read Bagdasarian’s messages, the record reveals only one who was sufficiently disturbed to actually notify the authorities.[21]
The Government contends that two additional facts show that Bagdasarian’s statements might reasonably be interpreted as a threat. The first is that when Bagdasarian made the statement that Obama “will have a 50 cal in the head soon,” Bagdasarian actually had .50 caliber weapons and ammunition in his home. The second is that on Election Day, two weeks after posting the messages, he sent an email *1122 that read, “Pistol ... plink plink plink Now when you use a 50 cal on a nigga car you get this,” and linked to a video of debris and two junked cars being blown up. Nobody who read the message board postings, however, knew that he had a .50 caliber gun or that he would send the later emails. Neither of these facts could therefore, under an objective test, “have a bearing on whether [Bagdasarian’s] statements might reasonably be interpreted as a threat” by a reasonable person in the position of those who saw his postings on the AIG discussion board. Parr, 545 F.3d at 502.
2. Subjective Intent
Even if “shoot the nig” or “[he] will have a 50 cal in the head soon” could reasonably have been perceived by objective observers as threats within the factual context, this alone would not have been enough to convict Bagdasarian under 18 U.S.C. § 879(a)(3). The Government must also show that he made the statements intending that they be taken as a threat. A statement that the speaker does not intend as a threat is afforded constitutional protection and cannot be held criminal. In Black, the Court explained that the State may punish only those threats in which the “speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals.” 538 U.S. at 359, 123 S.Ct. 1536. And in Gordon, we held as a matter of statutory interpretation that Congress “construe[d] ‘knowingly and willfully’ [in § 879] as requiring proof of a subjective intent to make a threat,’ ” and thus requires the application of a subjective as well as an objective test. 974 F.2d at 1117 (alterations in original) (quoting 128 Cong. Rec. 21,218 (1982)).
We have explained, supra at 1118-21, why neither of Bagdasarian’s statements on its face constitutes a true threat unprotected by the First Amendment. Most significantly, one is predictive in nature and the other exhortatory. For the same reasons, the evidence is not sufficient for any reasonable finder of fact to have concluded beyond a reasonable doubt that Bagdasarian intended that his statements be taken as threats. See Jackson, 443 U.S. at 319, 99 S.Ct. 2781. Both under the constitutional requirement established in Black that we must read into § 879, and under the statutory requirement that we found extant in Gordon, the district court’s inference of Bagdasarian’s intent to threaten is unreasonable taken in context and does not, even when considered in the light most favorable to the prosecution, lie within the permissible range of interpretations of his message board postings. As a matter of law, neither statement may be held to constitute a “true threat.”
As we discussed in the previous section, the prediction that Obama “will have a 50 cal in the head soon” is not a threat on its face because it does not convey the notion that Bagdasarian himself had plans to fulfill the prediction that Obama would be killed, either now or in the future. Neither does the “shoot the nig” statement reflect the defendant’s intent to threaten that he himself will kill or injure Obama. Rather, “shoot the nig” expresses the imperative that some unknown third party should take violent action. The statement makes no reference to Bagdasarian himself and so, like the first statement, cannot reasonably be taken to express his intent to shoot Obama.[22]
*1123 As with our analysis of the objective test, we do not confine our examination of subjective intent to the defendant’s statements alone. Relying on United States v. Sutcliffe, 505 F.3d 944 (9th Cir.2007), the Government points to the two facts that we discussed in our analysis of objective understanding as evidence that Bagdasarian intended to make a threat: (1) that he was later found to possess a .50 caliber gun like the one he mentioned in the “Obama fk the niggar” posting, and (2) that the Election Day email referred to the use of “a 50 cal on a nigga car.” Neither fact is sufficient to prove beyond a reasonable doubt that Bagdasarian intended to make a threat when, two weeks before Election Day, he posted the two statements for which he was indicted.
In Sutcliffe, we affirmed a conviction under another threat statute, 18 U.S.C. § 875(c), which, in addition to the knowing transmission of an interstate threat, requires specific intent to threaten. 505 F.3d at 952, 960-61; see also United States v. Twine, 853 F.2d 676, 680 (9th Cir.1988). We held that the district court did not abuse its discretion by allowing the Government to present evidence of the defendant’s gun possession to demonstrate that he actually intended to threaten violence. Id. at 959. The fact of the defendant’s gun possession was not determinative of the defendant’s intent, however, but just one among many pieces of evidence relevant to the language and context of the threats that we considered in determining that the defendant had the requisite specific intent to threaten. Most important in Sutcliffe were the first-person and highly specific character of messages such as “I will kill you,” “I’m now armed,” and “You think seeing [your license plate number posted on my website] is bad ... trust us when we say [it] can get much, much, worse.... [I]f you call this house again ..., I will personally send you back to the hell from where you came.” Id. at 951-52 (first omission and second alteration in original).
Given that Bagdasarian’s statements, “Re: Obama fk the niggar, he will have a 50 cal in the head soon” and “shoot the nig” fail to express any intent on his part to take any action, the fact that he possessed the weapons is not sufficient to establish that he intended to threaten Obama himself. Similarly, the Election Day emails do little to advance the prosecution’s case. They simply provide additional information — weblinks to a video of debris and two junked cars being blown up and to an advertisement for assault rifles available for purchase online — that Bagdasarian may have believed would tend to encourage the email’s recipient to take violent action against Obama. But, as we have explained, incitement to kill or injure a presidential candidate does not qualify as an offense under § 879(a)(3).[23]
Taking the two message board postings in the context of all of the relevant facts and circumstances, the prosecution failed to present sufficient evidence to establish beyond a reasonable doubt that Bagdasarian had the subjective intent to threaten a presidential candidate. For the same reasons that his statements fail to meet the subjective element of § 879, given any reasonable construction of the words in his postings, those statements do not constitute a “true threat,” and they are therefore protected speech under the First Amendment. See Black, 538 U.S. at 359, *1124 123 S.Ct. 1536. Accordingly, his conviction must be reversed.
REVERSED.

. McIntyre v. Ohio Elections Comm’n, 514 U.S. 334, 382, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995) (Scalia, J., dissenting).

. Paul F. Boiler, Presidential Campaigns: From George Washington to George W. Bush 11 (2004).

. See Bruce L. Felknor, Dirty Politics 27 (1966).

. See Paul S. Herrnson, Congressional Elections: Campaigning at Home and in Washington 160 (1995).

. See id. The Cleveland story at least may have been true. See Jean Kinney Williams, Grover Cleveland 26 (2003).

. See, e.g., Eileen Sullivan, Obama Faces More Personal Threats than Other Presidents-Elect, Huffington Post (Nov. 14, 2008), http://www. huffingtonpost.com/2008/ll/14/obama-facesmore-personal_n_144005.html; Dave McKinney et ah, A Plot Targeting Obama? 3 in Custody May Be Tied to Supremacists, Said to Talk of Stadium Shooting, Chi. Sun-Times, Aug. 26, 2008, at 3.
Then-Senator Obama was the first presidential candidate in U.S. history for whom Secret Service protection was authorized before being nominated for the presidency. See Nedra Pickier, Racial Slur Diggers Early Protection for Obama: He Called on Secret Service to Monitor Big Crowds, Grand Rapids Pr., May 4, 2007, at A3; Shamus Toomey, "A Lot to Do with Race”: Durbin Says Obama Needs Secret Service in Part Because He's Black, Chi. Sun-Times, May 5, 2007, at 6.

.False accusations that a President is a member of an unpopular religious minority were prevalent in the 1930s. Wealthy critics of Franklin Delano Roosevelt and his policies referred to the New Deal as the Jew Deal, convinced that the President was a Jew named Rosenfeld who "had surrounded himself with Jews who made policy from a Jewish perspective for their own benefit,” Hasia R. Diner, The Jews of the United States, 1654 to 2000, at 212-13 (2006); Peter Novick, The Holocaust in American Life 42 (2000).
Today, there are a great number of critics of President Obama who continue to believe that he is a Muslim and many who still refuse to accept the fact that he is a native born citizen. See Lauren Green, Nearly 1 in 5 Americans Thinks Obama is a Muslim, Slavey Shows, FoxNews.com (Aug. 19, 2010), http:// www.foxnews.com/politics/2010/08/19-nearlyamericans-thinks-obama-muslim-surveyshows (reporting that survey found "those who say the president is a Muslim give him a negative job approval rating”); Brian Stelter, On Television and Radio, Talk of Obama’s Citizenship, N.Y. Times: Media Decoder, July 24, 2009 (noting that "conspiracy theorists *1115 who have claimed for more than a year that President Obama is not a United States citizen have found receptive ears among some mainstream media figures in recent weeks,” discussing some of America’s most prominent media figures).

. The complete second statement appears in the next paragraph.

. Neither statement is thereby deprived of constitutional protection, however, because urging others to commit violent acts “at some indefinite future time” does not satisfy the imminence requirement for incitement under the First Amendment. Hess v. Indiana, 414 U.S. 105, 108, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973) (holding that the imminence requirement under Brandenburg v. Ohio, 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969), is not satisfied by constitutionally protected speech that "amountfs] to nothing more than advocacy of illegal action at some indefinite future time”).

.In the twenty minutes between the time at which he posted the "Obama, fk the niggar” and the "shoot the nig” statements, Bagdasarian posted a message that concluded: "burp more VINOOOOOOOO.” Several hours later, he replied to another person’s message that he had reported Bagdasarian’s statements to the authorities, "Listen up crybaby ole white boy, I was drunk.”

. See, e.g., United States v. Stewart, 420 F.3d 1007, 1018 (9th Cir.2005) (discussing perceived inconsistency in circuit authority as to definition of constitutionally proscribable "true threat” before concluding that “we need not decide whether the objective or subjective 'true threat' definition should apply here ... because the evidence establishes that [the defendant's] statement was a 'true threat' under either definition and thus is not protected by the First Amendment” (footnote omitted)); United States v. Sutcliffe, 505 F.3d 944, 961-62 (9th Cir.2007) (citing Stewart for the proposition that "our ... case law” is "contradictory” as to whether "an objective, rather than subjective, test [should be applied] to determine whether [the defendant's] statements constituted true threats[,]” but holding that "any error in the 'true threats’ljury] instruction was harmless” because "the district court instructed the jury that specific intent to threaten is an essential element of a § 875(c) conviction, and thus the jury necessarily found that Defendant had the subjective intent to threaten in convicting him of the offense”).

. See United States v. Romo, 413 F.3d 1044, 1051 (9th Cir.2005); United States v. Lincoln, 403 F.3d 703, 707 (9th Cir.2005); United States v. Hanna, 293 F.3d 1080, 1083 (9th Cir.2002); Roy v. United States, 416 F.2d 874, 877 (9th Cir.1969).

. See United States v. Gordon, 974 F.2d 1110, 1117 (9 th Cir.1992), overruled on other grounds by Planned Parenthood of the Columbia/Willamette, Inc. v. Am. Coal. of Life Activists, 290 F.3d 1058 (9th Cir.2002) (en banc).

.Prior to Black, we did not always apply a subjective test when considering alleged violations of a threat statute. For example, although § 879 includes both an objective and subjective test, see Gordon, 974 F.2d at 1117, § 871 includes only an objective and no subjective test, see Roy, 416 F.2d at 877, even though both statutes require that threats be made "knowingly and willfully,” §§ 871; 879, and even though we have specifically "look[ed] for guidance,” in setting forth the statutory requirements of § 879, to Roy's interpretation of the "closely analogous” § 871. Gordon, 974 F.2d at 1117.
It appears that we tried in Roy to impose a lower burden for conviction under § 871, which applies to threats against a sitting President, because “[a] President’s death in office has worldwide repercussions and affects the security and future of the entire nation ... regardless of whether the person making the threat actually intends to assault the President....” Roy, 416 F.2d at 877 (citation omitted). Although in Roy, we sought to make it easier to punish threats against a President under § 871, the adoption of an objective standard serves the opposite function after Black. Because Black requires that the subjective test must be met under the First Amendment whether or not the statute requires it, an objective test is not an alternative but an additional requirement over-and-above the subjective standard.
To the extent that we may have suggested otherwise in a footnote in Romo, 413 F.3d at *1118 1051 n. 6 (declining, based on pre-Black precedent, to apply a subjective intent test under § 871(a) “because [the defendant] has not raised First Amendment issues), such analysis would be inconsistent with Black and must be limited to cases in which the defendant challenges compliance only with the objective part of the test and does not contend either that the subjective requirement has not been met, or that the statute has been applied in a manner that is contrary to the Constitution. In all other circumstances in which pure speech is prosecuted under a threat statute, we cannot apply exclusively an objective standard, and any subjective test must incorporate the constitutional requirement set forth in Black. 538 U.S. at 359, 123 S.Ct. 1536.
Because the statements at issue in the case before us fail to pass either of the two tests, we see no reason here to consider the question whether to retain an objective test for presidential threat statutes in view of Black. To be clear, we are not suggesting that an objective determination does not provide a worthwhile test or that statutes criminalizing threats against the President or others should require only a subjective test. We merely point out a paradox in our treatment of threat statutes now that Black requires proof of intent under the First Amendment in all such cases.

. In a footnote to the passage just quoted, Cassel distinguished United States v. Lincoln, 403 F.3d 703, 706 (9th Cir.2005), which relied on pre-Black cases to suggest in dicta that the First Amendment requires application of an objective rather than a subjective test. Cassel, 408 F.3d at 633 n. 9. Cassel pointed out that Lincoln “did not raise or consider the implications of Virginia v. Black," and therefore, in effect, that Lincoln must be treated simply as a pre-Black case. Id.

. See Woods v. Interstate Realty Co., 337 U.S. 535, 537, 69 S.Ct. 1235, 93 L.Ed. 1524 (1949) *1119 ("[W]here a decision rests on two or more grounds, none can be relegated to the category of obiter dictum.”).

. In Planned Parenthood, we applied a standard of review close to de novo to the question whether pure speech constitutes a “true threat” unprotected by the First Amendment. 290 F.3d at 1070. Here, both parties briefed and argued the case on the basis of the sufficiency-of-the-evidence standard of Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). For that reason, and because we would decide this case the same way under either Planned Parenthood or Jackson, we do not determine what standard of review applies here or in any future case.

. The Fourth Circuit has written that “an essential element of guilt [under § 871, which punishes threats against the President or successors to the presidency] is a present intention either to injure ... or to incite others to injure,” but added that "[m]uch of what we say here is dicta.” United States v. Patillo, 438 F.2d 13, 16 (4th Cir.1971) (en banc). No other circuit has concluded that incitement can be punished under a threat statute, and over forty years ago, in a case since cited approvingly in almost every presidential threat case in our circuit, we expressed doubt that § 871 makes criminal an intention or tendency to encourage others to injure the President. Roy, 416 F.2d at 877. We explained that "if Congress desired to prevent incitement of others to assault the President, then it could have limited the statute to make it a crime to incite or induce others to assault or attempt to assault the President." Id. Having previously “look[ed] for guidance,” in construing § 879, to Roy's interpretation of the “closely analogous” § 871, Gordon, 974 F.2d at 1117, we here follow Roy in refusing to find that incitement qualifies as an offense under § 879. We also reach that conclusion independently on the basis of the plain language of the statute. See 18 U.S.C. § 879(a)(3) (making it a crime to "knowingly and willfully threaten[] to kill, kidnap, or inflict bodily harm upon ... a major candidate for the office of President.”); see also supra at 1115 n. 9 (discussing imminence requirement for incitement under the First Amendment).

.The dissent’s interpretation of Bagdasarian’s statements as threats can be traced to its *1120 misplaced reliance on three cases. See Dissent at 1128-29. Hanna, which was decided before Black, reversed the threat conviction and remanded for a new trial, noting that if the defendant were "convicted again based on admissible evidence, he w[ould] be entitled to have the appellate court independently review the record to ensure that the surrounding facts found by the jury establish the constitutional fact of a true threat.” 293 F.3d at 1088. Planned Parenthood, also decided before Black, is readily distinguishable on the law and the facts: There can be no question that the anti-abortionist group "was aware that a 'wanted’-type poster would likely be interpreted as a serious threat of death or bodily harm by a doctor in the reproductive health services community who was identified on one, given the previous pattern of ‘WANTED’ posters identifying a specific physician followed by that physician’s murder.” 290 F.3d at 1063. The facts here present no such pattern. Finally, Romo declined altogether to address whether the defendant’s speech constituted a true threat under § 871(a) because he "has not raised First Amendment issues.” 413 F.3d at 1051 n. 6.

. In some circumstances, anonymity may generate greater concern because listeners cannot rely on the speaker's identity to discount any serious intentions. Cf. Doe ex rel. *1121 Doe v. Kamehameha Schs./Bernice Pauahi Bishop Estate, 625 F.3d 1182, 1190 (9th Cir.2010) (Reinhardt, J., joined by Kozinski, C.J., dissenting from denial of rehearing en banc) (rejecting the propositions that "plaintiffs may be unreasonable in fearing severe threats of physical retaliation because they are made via the internet” or that "litigants do not reasonably fear threats of serious harm when they are made by unidentified people, some of whom may not intend to carry them out”). In other circumstances, however, listeners may give less credence to anonymous statements because they cannot identify any association between the speaker and a group that engages in violence, or otherwise ascertain that the speaker is an individual whose threat should be taken seriously. Whether a particular speaker's threat would be taken more or less seriously if made anonymously may depend on who that speaker is. Still, all threats against the President or a major presidential candidate must be taken seriously until it is established that there is no reason to do so.

. The Stipulated Facts indicate only that Base "saw the ‘shoot the nig' message,” that he "was concerned that the posting threatened harm to Barack Obama,” and that he "telephoned the Los Angeles Field Office of the United States Secret Service and reported the 'shoot the nig' posting.” The Record does not contain evidence as to whether Base posted a response to the message board. Even under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the facts are insufficient to support a verdict that Bagdasarian threatened to kill Obama. The "critical inquiry” in Jackson “is whether the record evidence,” when viewed by any rational trier of fact in the light most favorable to the prosecution, "could reasonably support a finding of guilt beyond a reasonable doubt.” Id. at 318-19, 99 S.Ct. 2781 (emphasis added). Here, the record is far too thin to support such a conclusion. See also 1119 n. 17 (noting that in Planned Parenthood, we applied a standard of review close to de novo).

. We are aware that an Internet radio host was recently convicted by a federal jury under 18 U.S.C. § 115(a)(1)(B), which punishes threats against, inter alia, a federal judge with intent to intimidate or retaliate. He was convicted for statements made regarding three Seventh Circuit judges who had issued a ruling that he disagreed with. See United States v. Turner, 1:09-cr-00650-DEW-JMA (E.D.N.Y. Aug. 13, 2010); Mark Fass, Blogger Found Guilty of Threatening Judges in Third *1123 Federal Trial, N.Y. L.J., Aug. 16, 2010, at 1. That case has not reached the appellate courts and thus does not affect our analysis here. It would in any event not cause us to change our view with respect to the constitutional question answered by Black or the result that we reach in this case.

. See supra at 1119 n. 18.