**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-1024
_____

UNITED STATES OF AMERICA

v.

DAVIT DAVITASHVILI,
                                        Appellant
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-21-cr-00255-001)
District Judge: Honorable Mark A. Kearney
_____

Argued on February 7, 2024

Before: HARDIMAN, SCIRICA, and SMITH, *Circuit
Judges*.

(Filed: April 1, 2024)

Lisa Evans Lewis
Brett G. Sweitzer
Abigail E. Horn [Argued]

Federal Community Defender Office for the
Eastern District of Pennsylvania
601 Walnut Street
The Curtis Center, Suite 540 West
Philadelphia, PA 19106
        *Counsel for Appellant*

Jacqueline C. Romero
Robert A. Zauzmer
Thomas M. Zaleski [Argued]
Office of United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106
        *Counsel for Appellee*

_____

OPINION OF THE COURT
_____


HARDIMAN, *Circuit Judge*.

A jury convicted Davit Davitashvili of violating 18 U.S.C. § 875(c), which makes it a crime to "transmit[] . . . any threat to injure the person of another." He appeals his judgment of conviction, arguing that the District Court permitted the jury to convict him for constitutionally protected speech. Because

we hold that Davitashvili's threats were not protected speech under the First Amendment, we will affirm.

I

A

This case arises from a Philadelphia love story that ended badly. Appellant Davitashvili is a native of Georgia, a country on the Black Sea. He immigrated to the United States in 2004 and became naturalized in 2012. Davitashvili is a mixed martial artist who once fought professionally.

In 2011, Davitashvili met Olga Volosevich, a Ukrainian national living in Philadelphia. Volosevich had come to the United States in 2009 and would become a citizen in 2022. She began dating Davitashvili soon after meeting him, and they spoke to each other in Russian throughout their relationship. They married in August 2016. Shortly after, the couple visited their native countries in Eastern Europe, where all of Davitashvili's relatives and most of Volosevich's relatives still lived.

When the couple returned to Philadelphia, their relationship deteriorated. As Volosevich later testified, Davitashvili "started abusing [her] physically, emotionally, and verbally, and [her] life became intolerable." App. 334–35. Davitashvili "used to call [her] all kinds of nasty names," such as "a whore," "an imbecile," and "a bitch." App. 390. He likewise accused Volosevich of "plotting against him with all [his] enemies" to "poison[] him" or get him "incarcerated for being a pedophile." *Id.* As to physical abuse, Volosevich explained that Davitashvili would "hit [her] on the head with

an open hand," which "for him . . . was like punching with a fist." App. 389.

Volosevich suggested divorce in early 2019 and left Davitashvili in October of that year. The month after Volosevich left him, Davitashvili departed the United States for his native Georgia. Only then did Volosevich return to the home that she and Davitashvili had previously shared. She found the interior trashed and many of her valuables missing—including Christian icons that were gifts from her mother.

B

Soon after Davitashvili left the United States, he and Volosevich began messaging each other using Viber, a texting app popular in Eastern Europe. These text messages were in the Russian language, but translators prepared an English version for trial, and the parties stipulated to its accuracy. Davitashvili's messages in early 2020 accused Volosevich of "defend[ing] people who treated [him] despicably, who are rats and fake, all of this is called betrayal and, respectively, cheaters." App. 400. He likewise texted Volosevich: "When I return, I will get the FBI on your backs. . . . Don't think that this whore, your lawyer, will be able to help you and ending with Georgie's weapon." App. 406. And in April 2020, he messaged her: "Whatever it was that you mixed in for me, you made it with him. . . . I let the person that I hated close to you because of you. Where's the justice? F*** you both." App. 417.

Those messages culminated in a May 10, 2020 conversation for which Davitashvili was indicted. At 2:14 p.m. Eastern Time, Davitashvili texted Volosevich:

4

I don't f***ing care about anything. You are wrong about me. When will I start? That's when it will all be over. Whore, I don't f***ing care even if the FBI is behind you. Will f*** you up. I have nothing to lose. They will see that soon. Whore, for those will approach, the only thing that will stop me is death. Don't f***ing care about the before. Go ahead, whore, come clean while you are the first slut. I have nothing to lose. F*** all systems. Let me be the victim.

App. 428.

Davitashvili followed up just seven minutes later: "You have two paths forward, either come clean, or the second one is wheelchair. Make a choice, whore, together with your co-workers that will soon be sucking my d***. Ha-Ha-Ha." *Id.* This prompted Volosevich to respond: "Are you continuing to threaten me? I am going to be in a wheelchair? I am going to write a [police] report right now." App. 429. Davitashvili immediately replied: "No one knows what the future holds, whore. Maybe even worse. Believe me, you will be f***ed soon." *Id.* He then wrote: "Go ahead and file for a divorce. I will figure out the rest when I return." App. 430.

At 3:02 p.m., Davitashvili added: "And after everything, you are threatening me, whore. I am not going to leave your DNA if I wish so, slut. I will start with Ukraine, whore." *Id.* Volosevich responded: "I am not threatening." *Id.* Davitashvili wrote back at 3:52 p.m.:

Me neither. We will see what the future holds. I cannot control myself anymore. You will see and hear when I return what will happen to such a

KGB like yourself, whore. If I don't have enough time to everyone, then I will send many who is needed to be sent, like c*** Pele and others, in the name of the USA, whore. I have one life that needs to end fairly when all of this won't f***ing matter. I want for everyone to know. I will not just depart this life. I will take someone with me. At least five, I swear. I don't know how to gather you all together, but at a minimum I will take 15 of you and will depart this life peacefully. I don't know how to gather you all together, d***s. Thinking that after my life there won't be another life in the USA as despicable as what you have caused for me, whore.

App. 430–31. Half an hour later, Volosevich replied: "I have a seven-year-old brother. He did nothing bad to you. He is my DNA. You want to kill him too?" App. 431. It took Davitashvili almost eleven hours to respond: "May God give him health. He will never grow up to be like you bitches. And just leave my life altogether, please. Go file for a divorce, please, and free me and everything will work itself out, whore." *Id.*

Volosevich did not immediately report the threats because Davitashvili was still abroad, and Volosevich believed he would stay there. But a year later, Davitashvili's sister told Volosevich that Davitashvili was returning to the United States. Volosevich then filed a complaint with the FBI about the threatening messages, which led the FBI to open an investigation. Davitashvili landed in New York in June 2021 and was arrested upon his arrival.

C

Davitashvili was charged with violating 18 U.S.C. § 875(c), the federal threats statute, by sending Volosevich messages that "contained threats to injure, maim, and kill [her], and to kill others." App. 23. The indictment pinpointed the Viber messages from May 10, 2020. At trial, the Government argued that Davitashvili "was threatening to kill, not only Ms. Volosevich, his wife at the time, they are now divorced, but also five, ten, 15 other people." App. 220. With no objection from Davitashvili, the District Court gave the following jury charge:

> As you see from this verdict form, you must consider whether the United States has proved beyond a reasonable doubt that Davit Davitashvili transmitted a communication containing a threat in interstate or foreign commerce. It reads, continues: On May 10, 2020, containing threats to injure, maim, and kill Olga Volosevich and to kill others. That's the question. No others. . . .
>
> I'm now going to tell you what those words mean as a matter of law. Mr. Davitashvili is charged with one count of transmitting a communication containing a threat in interstate or foreign commerce. To find Mr. Davitashvili guilty of this offense, you must find the United States proved each of the following four things beyond a reasonable doubt: First, Mr. Davitashvili knowingly transmitted a communication; second, the communication he sent, if you find he did, contained a threat to kidnap or injure a

7

person or a group of people; third, Mr. Davitashvili transmitted the threat for the purpose of making a threat or knowing the communication would be viewed as a threat; and fourth, that Mr. Davitashvili transmitted the communication in interstate or foreign commerce.

App. 710–11.

The jury returned a guilty verdict later that same day. The District Court then entered judgment against Davitashvili, who timely appealed.[1]

## II

Davitashvili argues that constitutional error tainted his conviction. He concedes that threats to injure a particular individual are unprotected "true threats." But he contends that his threats to injure "others" were constitutionally protected speech. So the District Court erred by allowing the jury to return a general guilty verdict based on either of two theories—the "kill Olga Volosevich" theory, which Davitashvili concedes was constitutionally sound, and the "kill others" theory, which he claims violated the First Amendment.

Davitashvili did not preserve this argument in the District Court. So we review for plain error. Fed. R. Crim. P. 52(b). Plain-error review involves four prongs, the last of which is discretionary. *United States v. Greenspan*, 923 F.3d 138, 147 (3d Cir. 2019). To prevail under this framework,

---

[1] The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291.

Davitashvili must show (1) a legal error that is (2) obvious and (3) has affected his substantial rights. *Puckett v. United States*, 556 U.S. 129, 135 (2009). If these first three prongs are met, the court has discretion to correct the error if (4) it seriously affects the fairness, integrity, or reputation of judicial proceedings. *Id*. "Meeting all four prongs is difficult, as it should be." *Id.* (cleaned up).

III

"From 1791 to the present, . . . our society, like other free but civilized societies, has permitted restrictions upon the content of speech in a few limited areas," including obscenity, defamation, and fighting words. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382–83 (1992). "'True threats' of violence" constitute one such "historically unprotected category of communications." *Counterman v. Colorado*, 600 U.S. 66, 74 (2023). As the Supreme Court explained in *Counterman*: "[t]rue threats are serious expressions conveying that a speaker means to commit an act of unlawful violence." *Id.* (cleaned up).

Twenty years before *Counterman*, the Supreme Court instructed that "'[t]rue threats' *encompass* those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Virginia v. Black*, 538 U.S. 343, 359 (2003) (emphasis added). Despite *Black*'s use of "encompass"—a synonym of "include," *see* Merriam-Webster's Collegiate Dictionary (1999), *s.v.*, *encompass*—Davitashvili and the Government agree that this sentence comprehensively defines the category of true threats. The dissent in *Counterman* treated this part of *Black* as providing the necessary conditions for a statement to count as a true threat. *See Counterman*, 600 U.S. at 113 (Barrett, J.,

dissenting). And we have suggested that *Black* exhaustively defines true threats, without holding as much. *See Gov't of V.I. v. Vanterpool*, 767 F.3d 157, 167 (3d Cir. 2014).[2] Giving Davitashvili the benefit of the doubt, we assume, without deciding, that *Black* comprehensively defines the category of true threats. *See Waters v. Churchill*, 511 U.S. 661, 680 (1994); *First Amend. Coal. v. Jud. Inquiry & Rev. Bd.*, 784 F.2d 467, 472 (3d Cir. 1986).

Under this assumed definition, a communication must threaten "a particular individual or group of individuals" to qualify as an unprotected true threat. *Black*, 538 U.S. at 359. Citing this particularization requirement, Davitashvili challenges his conviction on two bases. He argues that: (1) his threat to kill "others" did not target a particular individual or group of individuals; and (2) the jury was instructed it could convict without finding that he threatened a particular individual or group of individuals. We disagree with both

---

[2] As the Eleventh Circuit has noted, the Supreme Court "never stated that the category of true threats is limited to such statements, only that the category 'encompass[es]' them." *United States v. Fleury*, 20 F.4th 1353, 1373 (11th Cir. 2021) (alteration in original). But other courts of appeals have read *Black* as comprehensively defining the category of true threats. *See United States v. Dutcher*, 851 F.3d 757, 761 (7th Cir. 2017); *United States v. Floyd*, 458 F.3d 844, 848 (8th Cir. 2006); *United States v. Bagdasarian*, 652 F.3d 1113, 1116 (9th Cir. 2011); *United States v. Wheeler*, 776 F.3d 736, 743 (10th Cir. 2015). We need not take sides in this circuit split to resolve this appeal.

arguments and hold that there was no error under the Free Speech Clause of the First Amendment.

A

Davitashvili argues that his messages, insofar as they targeted people other than Volosevich, were protected speech because they "did not communicate a threat to either 'a particular individual or group of individuals.'" Davitashvili Br. 19 (quoting *Black*, 538 U.S. at 359). Assuming that particularization is an essential element for a threats conviction, we must determine whether a "rational trier of fact could have found the essential element[] of the crime beyond a reasonable doubt." *United States v. Zayas*, 32 F.4th 211, 217 (3d Cir. 2022) (cleaned up), *cert. denied*, 143 S. Ct. 830 (2023). The trial record shows that the jury could have found beyond a reasonable doubt that Davitashvili's threats to injure "others" targeted particular people.

Davitashvili was indicted for the text messages he sent on May 10, 2020. At 2:21 p.m. that day, Davitashvili texted Volosevich: "You have two paths forward, either come clean, or the second one is wheelchair. Make a choice, whore, together with your *co-workers* that will soon be sucking my d***." App. 428 (emphasis added). In other words, Davitashvili was warning Volosevich and her "co-workers" to make a choice between coming clean and the wheelchair. From this message, a jury could find that Davitashvili was threatening to injure both Volosevich and her "co-workers."

Around 40 minutes after the "wheelchair" message, Davitashvili wrote to Volosevich: "I am not going to leave your DNA if I wish so, slut. I will start with Ukraine, whore." App. 218–19. As Volosevich testified, she took this to mean

11

that Davitashvili "will kill my family and leave no DNA of ours." App. 519. And as the Government emphasized at trial, it took Davitashvili until the next day to explain that he did not intend to kill Volosevich's brother.

Perhaps most of all, the 3:52 p.m. message shows that the "others" were particular people, at least one of whom was named:

> I cannot control myself anymore. You will see and hear when I return what will happen to such a KGB like yourself, whore. If I don't have enough time to everyone, then I will send many who is needed to be sent, like c\*\*\* Pele and others, in the name of the USA, whore. I have one life that needs to end fairly when all of this won't f\*\*\*ing matter. I want for everyone to know. I will not just depart this life. I will take someone with me. At least five, I swear. I don't know how to gather you all together, but at a minimum I will take 15 of you and will depart this life peacefully.

App. 430–31.

As the Government argues, a jury could interpret this message as threatening the couple's friends and acquaintances. Davitashvili wrote: "If I don't have enough time to everyone, then I will send many who is needed to be sent, like c\*\*\* Pele and others." App. 430. A jury could find this meant that Davitashvili was threatening to kill as many people on his enemies list as he could—including Pele—in the limited time he had. Volosevich testified that Pele was Davitashvili's friend. And she also testified that, in previous phone

12

conversations, Davitashvili "gave some names" of the five to fifteen people he intended to kill. App. 434. Moreover, as the Government points out, the message makes little sense if these people were not specific individuals. Davitashvili spoke of the need to "gather [them] all together," App. 430, but there would be no such need if he were not targeting particular people.

Davitashvili's earlier messages also contextualize the meaning of the May 10 text messages. In a March text message, Davitashvili complained that Volosevich was taking the side of "other people who didn't treat him well." App. 411. Volosevich testified: "He used to say that people at his old work are his enemies; places where he used to work, people are his enemies; neighbors are his enemies; as well as his acquaintances and friends." App. 412. Volosevich also discussed an April conversation in which Davitashvili accused Vaha, his and Volosevich's "mutual friend," of "using steak sauce, mix it in, to poison him with it." App. 420–21. Based on these facts, a jury could find that the five to fifteen people whom Davitashvili expressed an intent to kill were acquaintances of Davitashvili and Volosevich.[3]

Our sister courts have held that threats less particularized than Davitashvili's counted as unprotected true

---

[3] Davitashvili contends that the Government's theory—that the threat was directed at acquaintances, associates, and enemies whom the couple knew—is newly presented on appeal. Not so. The Government argued below that the "others" whom Davitashvili threatened to kill were people he wanted "to settle accounts and scores with." App. 652. In other words, as Volosevich testified extensively, they were people whom Davitashvili knew and with whom he had interpersonal conflicts.

threats that supported criminal convictions. For example, in *United States v. Khan*, the defendant posted Facebook messages threatening to kill "'college students,' 'vulnerable individuals,' people 'walking their dogs,' 'high net worth individuals,' and 'witnesses' that 'get in the way,'" claiming "'the loop area of Chicago to the Northern Lincoln Park area' as his 'free kill zone.'" 937 F.3d 1042, 1046 (7th Cir. 2019) (cleaned up). Khan argued that these messages were not sufficiently targeted to qualify as true threats, but the Seventh Circuit disagreed. *See id.* at 1055. The court recognized that Khan had threatened anyone "who happened to be in the wrong place (Khan's defined 'free kill zone') at the wrong time (before his June 8, 2015 flight to Pakistan)." *Id.* Yet this sufficed to "infer Khan's intent to commit an act of unlawful violence towards a particular group of individuals." *Id.* The threat of violence directed at an entire city region before Khan's departure abroad counted as sufficiently particularized. So too here with Davitashvili's threat of violence directed at some fifteen acquaintances upon his return to the United States.

The Tenth Circuit's decision in *United States v. Stevens*, 881 F.3d 1249 (10th Cir. 2018), also supports our conclusion that Davitashvili's threats toward "others" (that is, people other than Volosevich) were sufficiently particularized. In *Stevens*, the defendant "targeted messages of deadly action at [Tulsa Police Department] officers generally." 881 F.3d at 1255. Taking particularization as a requirement for a true threat, *see id.* at 1253, the court held that "a reasonable jury could find from their language and context that [these messages] were true threats," *id.* at 1255. The group Davitashvili targeted—

fifteen associates—is more discrete than the entire police department in *Stevens*.

B

We next turn to Davitashvili's argument that the jury charge was legally erroneous. As part of the jury instructions, the District Court read the language of the verdict form, which was drawn from the indictment:

> As you see from this verdict form, you must now consider whether the United States has proved beyond a reasonable doubt that Davit Davitashvili transmitted a communication containing a threat in interstate or foreign commerce. It reads, continues: On May 10, 2020, containing threats to injure, maim, and kill Olga Volosevich and *to kill others*.

App. 710 (emphasis added). Davitashvili contends that the District Court erred in including the words "to kill others" in the instruction. This instruction, Davitashvili argues, permitted the jury to convict either on a valid theory (Davitashvili had threatened Volosevich) or on an invalid theory (Davitashvili had threatened unspecified "others") such that it is impossible to tell which theory undergirded the conviction. According to Davitashvili, the inclusion of this erroneous alternative theory requires us to vacate the conviction and remand for a new trial. *See United States v. Wright*, 665 F.3d 560, 570–72 (3d Cir. 2012).

We disagree. Jury "instructions must be evaluated not in isolation but in the context of the entire charge." *Jones v. United States*, 527 U.S. 373, 391 (1999). After reading the

15

allegedly erroneous words of the indictment and verdict form, the District Court summarized the law: "To find Mr. Davitashvili guilty of this offense, you must find the United States proved . . . beyond a reasonable doubt . . . [that] the communication he sent, if you find he did, contained a threat to kidnap or injure *a person or group of people*." App. 710 (emphasis added).

The jury instruction thus does not contain the error that Davitashvili alleges. To convict, the jury had to find that Davitashvili's communication "contained a threat to kidnap or injure a person or group of people." App. 710. The instruction accurately summarizes the statutory text, which makes it a crime to transmit, in interstate or foreign commerce, "any communication containing any threat to kidnap any person or any threat to injure the person of another." 18 U.S.C. § 875(c). And it broadly tracks the language of *Virginia v. Black* which, as we assume, requires a threat to injure a "particular individual or group of individuals." 538 U.S. at 344.

Davitashvili objects to the jury instruction because it refers to a "person or group of people" rather than a "*particular* person or group of people." But instructing that there must be a threat to "injure a person or group of people" rules out convicting based on "general[ized]" threats to no one in particular. *Counterman*, 600 U.S. at 113 (Barrett, J., dissenting). And, at one point, *Virginia v. Black* itself described a "threat to a person or group of persons" as "constitutionally proscribable," without the extra adjective "particular." *See Black*, 538 U.S. at 360.

We also note that the Seventh Circuit approved the language here—*i.e.*, the communication must threaten violence against "a person or a group of people," App. 710—holding

16

that there was "no error in the district court's jury instructions," *Khan*, 937 F.3d at 1052. That court first quoted the relevant language of the jury instruction: "A true threat is a serious expression of intent to commit unlawful physical violence against another person or a group of people." *Id.* at 1051. It then quoted the relevant language from *Virginia v. Black*, describing a true threat as "a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Id.* (cleaned up). And it concluded that the jury instructions "accurately and thoroughly summarized applicable law." *Id.* We agree with that well-reasoned decision of our sister court.

\* \* \*

As the trial record in this case shows, a reasonable jury could have found that Davitashvili's threats against people other than Volosevich targeted particular individuals. And the District Court did not err in instructing the jury that it could convict based on Davitashvili's threats to "kill others": the jury had to find that Davitashvili had threatened to "injure a person or a group of people." App. 710. We accordingly hold that no error tainted Davitashvili's conviction.

IV

Even if our conclusion of no error were mistaken, Davitashvili's conviction would still stand for want of plain error. To overturn his conviction under plain-error review, Davitashvili must show not only that the District Court erred, but also that the error was obvious, that it affected his substantial rights, and that it seriously affects the fairness, integrity, or public reputation of judicial proceedings. *See*

17

*Puckett*, 556 U.S. at 135. He has not met any of the latter three prongs.

A

An error cannot be obvious when it is "subject to reasonable dispute." *Id.* The Supreme Court has explained that the category of true threats "*encompass[es]* . . . serious expression of an intent to commit . . . violence to a particular individual or group of individuals." *Black*, 538 U.S. at 359 (emphasis added). But the Court has never held that a threat must be particularized to count as a true threat. By citing a dissent for the proposition that a "statement must . . . threaten violence 'to a particular individual or group of individuals'" to qualify as a true threat, Davitashvili effectively concedes as much. *See* Davitashvili Br. 17–18 (quoting *Counterman*, 600 U.S. at 113 (Barrett, J., dissenting)). Davitashvili also cites no precedential court of appeals case—and we have found none—overturning a conviction because the threat was not sufficiently particularized. So one could reasonably dispute whether particularization is a necessary condition for a statement to qualify as a true threat.

B

An error goes to the defendant's substantial rights when the defendant can show that it "affected the outcome of the district court proceedings." *Puckett*, 556 U.S. at 135. In other words, the defendant ordinarily "must show a reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Molina-Martinez v. United States*, 578 U.S. 189, 194 (2016) (cleaned up).

18

Davitashvili has not shown that, but for the inclusion of the "kill others" theory at trial, the outcome would have been different. For starters, it is implausible that the jury convicted Davitashvili for threatening "others," but *not* for threatening Volosevich. The threats against Volosevich were the focus of the Government's case. As the jury heard at trial, Davitashvili repeatedly threatened violence toward Volosevich. For example, he messaged her: "Whore, I don't f***ing care even if the FBI is behind you. Will f*** you up," App. 428; "You have two paths forward, either come clean, or the second one is wheelchair," *id.*; and "Believe me, you will be f***ed soon," App. 429.

Even Davitashvili's threats of violence toward other people included Volosevich. In the message that most obviously targeted multiple people, Davitashvili wrote to Volosevich: "I don't know how to gather *you all* together, but at a minimum I will take *15 of you* and will depart this life peacefully. I don't know how to gather *you all* together." App. 430–31 (emphasis added). In another message that plainly threatened individuals other than Volosevich, Davitashvili wrote to Volosevich: "You have two paths forward, either come clean, or the second one is wheelchair. Make a choice, whore, *together with your co-workers* that will soon be sucking my d***." App. 428 (emphasis added). Davitashvili was threatening other people as part of a group that included Volosevich. So omitting the "kill others" theory likely would not have changed the outcome: the jury probably would have convicted Davitashvili for the threats to Volosevich alone.[4]

---

[4] That the jury was briefly deadlocked does not change our conclusion. The jury had deliberated for less than four hours before reaching an impasse. After hearing the *Allen* charge

C

Finally, any error would not seriously affect the fairness, integrity, or public reputation of judicial proceedings. This prong "inherently requires a case-specific and fact-intensive inquiry." *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1909 (2018) (cleaned up). In this case, Davitashvili, a former professional fighter, told Volosevich that he "w[ould] f*** [her] up," and that she "ha[d] two paths forward, either come clean, or the second one is wheelchair." App. 428. Threatening one person alone suffices for conviction under 18 U.S.C. § 875(c), which criminalizes "any threat to injure the person of another."

"Here, the Government presented overwhelming evidence" that Davitashvili had threatened Volosevich in violation of § 875(c). *United States v. Vazquez*, 271 F.3d 93, 105 (3d Cir. 2001). Even if it had been error to permit a conviction on the alternative theory that Davitashvili had threatened to "kill others," that error would not seriously affect the fairness, integrity, or reputation of the proceedings. So Davitashvili falls well short of satisfying the onerous plain-error standard.

\*　　\*　　\*

For the reasons stated, Davitashvili's trial was error-free. And even had error occurred, it would not have been obvious, would not have affected Davitashvili's substantial rights, and likewise would not affect the fairness, integrity, or

---

around 2:00 p.m., *see Allen v. United States*, 164 U.S. 492, 501–02 (1896) the jury delivered its guilty verdict around 4:00 p.m. So the jury deliberated for only six hours.

20

reputation of the proceedings. We will therefore affirm the judgment of conviction.