**Braeden BURGE by and through his guardian at litem Kelly BURGE, Plaintiff,**

v.

**COLTON SCHOOL DISTRICT 53, Defendants.**

No. 3:14–00605–ST.

United States District Court, D. Oregon, Portland Division.

Signed April 17,.2015.

Cozette T. Tran–Caffee, William T. Patton, Lane Powell, PC, Portland, OR, for Plaintiff.

Blake H. Fry, Peter R. Mersereau, Mersereau & Shannon, LLP, Portland, OR, for Defendants.

## OPINION AND ORDER

MOSMAN, District Judge.

This case presents the type of situation the Ninth Circuit recently analogized to walking a tightrope—a school administration faced with a potential threat of violence and therefore required to balance school safety against the constitutional rights of its students.[1] Here the Colton School District ("CSD") decided to suspend Braeden Burge ("Braeden") for his out-of-school comments made on Facebook. Braeden now alleges claims under 42 U.S.C. § 1983 for violations of his First Amendment right to free speech ("First Claim") and his Fourteenth Amendment right to due process ("Second Claim"). The parties filed competing motions for summary judgment and Magistrate Judge Stewart issued a Findings and Recommendation ("F & R") [23], recommending that summary judgment be granted in favor of Braeden on the First Claim and in favor of CSD on the Second Claim. Upon review, I agree with Judge Stewart's recommendations, and I ADOPT the F & R as my own opinion. I write only to address CSD's objection that the F & R failed to adequately account for Veronica Bouck's reaction when concluding that Braeden's comments did not trigger the school's ability to restrict speech that "would materially and substantially interfere with the requirements of appropriate discipline in the operation of the school." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 509, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (citations omitted).

## BACKGROUND

At the time of the incident in question, Braeden was a fourteen-year-old eighth-grade student at Colton Middle School ("CMS"). Upon learning that he had received a "C" from his health teacher, Ms. Bouck, and subsequently being grounded by his mother for a portion of the summer, Braeden vented his frustration in a series of comments on his personal Facebook page. Braeden initially posted that he wanted to "start a petition to get mrs. Bouck fired, she's the worst teacher ever." After a friend asked "what did [Ms. Bouck] do?" Braeden responded "She's just a bitch haha." When his friend wrote back "XD HAHAHAHA!!," Braeden responded "Ya haha she needs to be shot." Braeden's mother monitors Braeden's Facebook page on a daily basis and within twenty-four hours instructed Braeden to delete the entire post, which he did.

---

1. "With the advent of the Internet and in the wake of school shootings at Columbine, Santee, Newtown and many others, school administrators face the daunting task of evaluating potential threats of violence and keeping their students safe without impinging on their constitutional rights. It is a feat like tightrope balancing, where an error in judgment can lead to a tragic result." *Wynar v. Douglas Co. Sch. Dist.*, 728 F.3d 1062, 1062 (9th Cir.2013).

Braeden posted these comments from his home computer on a day that school was not in session. Only those Facebook users whom Braeden had confirmed as "friends" would have been able to view the comments he posted. Braeden has never been Facebook friends with Ms. Bouck (or any other CMS or CSD employee or staff member) and did not intend for Ms. Bouck to see his comments. Braeden Decl. [14] ¶ 4. Braeden did not intend to threaten or otherwise communicate with Ms. Bouck and did not seriously believe that Ms. Bouck should be shot. Braeden Depo. [13] Ex. 1 pp. 33–34. Braeden was not even serious about starting a petition to get Ms. Bouck fired. *Id.* at 30. Instead, his only purpose in posting these comments was "to elicit a response from [his] friends, just to see what they thought about it." *Id.* at 29.

Six weeks later, the parent of another CMS student anonymously placed a printout of Braeden's Facebook post in the school mailbox of CMS's principal, Kara Powell. Upon receiving the printout, Principal Powell called Braeden to her office where she questioned him, showed him CSD's applicable policies, and gave him a three-and-one-half day in-school suspension. According to Principal Powell, Braeden was "respectful . . . and compliant." Powell Depo., [13] Ex. 6 p. 15. After deciding the punishment, Principal Powell also called Braeden's mother, who explained that she had already spoken with Braeden about the issue and argued that CMS could not discipline her child for misconduct that occurred outside of school. Principal Powell suspended Braeden despite Ms. Burge's opposition.

Braeden had never before been disciplined by CMS or CSD for any act of violence and had never been convicted of a juvenile crime of any kind. Neither Principal Powell nor CSD Superintendent Linda Johnson investigated whether Braeden had access to or experience with guns, contacted the police, or referred him to a counselor. Furthermore, Principal Powell did not discuss the Facebook posts with any of Braeden's other teachers and did not investigate whether Braeden had made subsequent Facebook posts of a similar nature. Ms. Bouck did not take off any time from work as a result of Braeden's Facebook posts.

After his suspension, Braeden returned to classes and completed the last week of eighth grade without incident. Although Ms. Bouck was allegedly "scared," "nervous," and "upset" about Braeden's comments, and consequently asked the school administration to keep Braeden out of her class, she accepted the school's decision for Braeden to return and did not discuss the comments with him or with any other CMS teachers. Braeden also attended a class field trip supervised by Ms. Bouck. Unbeknownst to Braeden, he was followed that day by an educational assistant, who noted there were no disciplinary problems.

### LEGAL STANDARD

■ The magistrate judge makes only recommendations to the court, to which any party may file written objections. The court is not bound by the recommendations of the magistrate judge, but retains responsibility for making the final determination. The court is generally required to make a de novo determination regarding those portions of the report or specified findings or recommendation as to which an objection is made. 28 U.S.C. § 636(b)(1)(C). However, the court is not required to review, de novo or under any other standard, the factual or legal conclusions of the magistrate judge as to those portions of the F & R to which no objections are addressed. *See Thomas v. Arn,* 474 U.S. 140, 149, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *United States v. Rey-*

*na–Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003). While the level of scrutiny under which I am required to review the F & R depends on whether or not objections have been filed, in either case, I am free to accept, reject, or modify any part of the F & R. 28 U.S.C. § 636(b)(1)(C).

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56(a). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). On a motion for summary judgment, the court "draws all justifiable inferences in favor of the nonmoving party." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir.2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

## DISCUSSION

■ CSD objects to Judge Stewart's conclusion that Braeden's comments did not trigger the school's ability to restrict speech that "would materially and substantially interfere with the requirements of appropriate discipline in the operation of the school." *Tinker*, 393 U.S. at 509, 89 S.Ct. 733. Although the Supreme Court has never directly applied this test to off-campus student speech, the Ninth Circuit has done so, holding that "when faced with an identifiable threat of school violence, schools may take disciplinary action in response to off-campus speech that meets the requirements of *Tinker*." *Wynar v. Douglas Co. Sch. Dist.*, 728 F.3d 1062, 1069 (9th Cir.2013). Accordingly, Judge Stewart applied the standard laid out in *Tinker* and concluded that Braeden's comments did not fit within its exception to First Amendment protections because the comments did not have a "material and substantial" impact on either classroom activities or administrative responsibilities.

■ CSD argues that Judge Stewart's analysis overlooks the effect that Braeden's comments had on Ms. Bouck—who was allegedly "scared," "nervous," and "upset," and consequently asked the school administration to keep Braeden out of her class. CSD contends that this reaction is sufficient to support a rational juror in finding that Braeden's comments caused a material and substantial interference with school discipline.[2] Therefore, CSD objects to Judge Stewart's conclusion that summary judgment is appropriate.

In analyzing the question of whether Ms. Bouck's reaction could reasonably support a finding that Braeden's comments caused a material and substantial interference with appropriate school discipline, it is helpful to compare the Ninth Circuit's decision in *Wynar* to the Third Circuit's decision in *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915 (3rd Cir.2011). In *Wynar*, a high-school student was temporarily expelled for sending MySpace messages from his home computer to his friends, bragging about his array of weapons, threatening to shoot specific classmates on a specific date, and invoking the image of the Virginia Tech massacre.

---

**2.** CSD additionally contends that the interference necessary to trigger *Tinker's* exception to First Amendment protections need not entail a potential school shooting, but might also include the effect on staff morale or the resulting obligation to vet purported jokes to decide if any need be taken seriously. While this may be true, CSD provides no evidence that any such secondary effects actually occurred.

728 F.3d at 1065–66. His friends, with whom he had apparently joked about school violence in the past, became alarmed by the escalating tenor of the comments and brought them to the attention of their football coach and subsequently the school principal. *Id.* Considering the comments a serious threat, the school officials contacted the police, suspended the student for ten days, and ultimately expelled the student temporarily. *Id.* Others within the school community also took the perceived threat seriously, including the father of one of the girls mentioned in the messages, who would not let his daughter return to school if the student was there. *Id.* at 1071. Consequently, even though the student insisted his comments were made in jest, the Ninth Circuit held that the school's punishment did not violate the student's First Amendment rights because the "school district officials reasonably could have predicted that they would have to spend considerable time dealing with parents' and students' concerns and ensuring that appropriate safety measures were in place." *Id.* (citation omitted).

In *J.S.*, a student was suspended for creating a fake MySpace profile parodying her middle-school principal with crude language and sexually explicit content. 650 F.3d at 920. The profile generated "general rumblings" in the school, led to a disruption of one teacher's class, and caused the student counselor—who also happened to be the Principal's wife—to reschedule some meetings. *Id.* at 922–23. However, the Third Circuit held that because of the outrageous nature of the profile, no reasonable person could have taken it seriously, and the record indicated that no one actually did. *Id.* at 929. Furthermore, while the court acknowledged the discomfort the offensive speech might have caused the Principal, it held that this did not constitute a material and substantial disruption because "[t]he Supreme Court

has held time and again, both within and outside of the school context, that the mere fact that someone might take offense to the content of the speech is not sufficient justification for prohibiting it." *Id.* at 930 n. 7 (citing *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 215 (3rd Cir.2001) (Alito J.)). Therefore, the Third Circuit held that the school violated the student's First Amendment rights because the fake profile did not create "a substantial disruption of or material interference with the school." *Id.* at 931.

Viewed in this context, Ms. Bouck's response—on its own—would not support a rational juror in finding that Braeden's comments caused a material and substantial interference with appropriate school discipline. Ms. Bouck's response is analogous to that of the Principal in *J.S.*, who was "angry," "upset," and "humiliat[ed]" by the out-of-school speech of his students. *Id.* at 922, 929. Without more, Ms. Bouck's response is insufficient to constitute a material and substantial interference with appropriate discipline *at the school. See LaVine v. Blaine Sch. Dist.*, 257 F.3d 981, 989 (9th Cir.2001) (holding that the decision to discipline speech must be supported by the existence of *specific facts* that could reasonably lead school officials to forecast disruption); *Chandler v. McMinnville Sch. Dist.*, 978 F.2d 524, 530 (9th Cir.1992) (denying argument that certain speech is inherently disruptive and holding instead that finding of substantial and material interference under *Tinker* must be based on established facts). In Braeden's case, there is no more. The comments did not cause a widespread whispering campaign at school or anywhere else. No students missed class and no CMS employees, including Ms. Bouck, missed work. Although Ms. Bouck initially protested having Braeden back in her class, she accepted the school's decision for him to return and did not discuss the

comments with either Braeden or with any other students or teachers at CMS. When Braeden returned from suspension, there were no further incidents and no discussions concerning the Facebook comments.

Perhaps most importantly, the school did not take any actions upon which a rational juror could find that it reasonably foresaw a threat to appropriate school discipline. Upon receiving the printout of Braeden's comments, neither Principal Powell nor Superintendent Johnson ever asked Braeden or his parents if he had access to guns, contacted the police, had Braeden evaluated by a mental health professional, discussed the comments with any of Braeden's other teachers, or investigated whether Braeden made similar, subsequent comments. Instead, Principal Powell simply required Braeden to sit in a school office near the teachers' mailboxes for three-and-a-half days. Without taking some sort of action that would indicate it took the comments seriously, the school can not turn around and argue that Braeden's comments presented a material and substantial interference with school discipline.

## CONCLUSION

Upon review of both the F & R and CSD's subsequent objections, I ADOPT the F & R as my own opinion. Accordingly, I DENY CSD's Motion for Summary Judgment [10] against Braeden's First Claim and GRANT it against Braeden's Second Claim. I GRANT Braeden's Cross Motion for Summary Judgment [12] on his First Claim and DENY it on his Second Claim. CSD's conduct and policies violated Braeden's First Amendment rights to free speech. CSD must remove Braeden's suspension from his school records and compensate Braeden for his reasonable attorney fees, costs and disbursements pursuant to 42 U.S.C. § 1988.

IT IS SO ORDERED.

## FINDINGS AND RECOMMENDATIONS

STEWART, United States Magistrate Judge:

### INTRODUCTION

Plaintiff, Braeden Burge ("Braeden"), alleges claims under 42 U.S.C. § 1983 against defendant, Colton School District ("CSD"), for violating his First Amendment right to free speech (First Claim) and his Fourteenth Amendment right to due process (Second Claim) when it punished him for comments he made on his private Facebook page from his own home, outside school hours, and while not participating in any school-sponsored activity. This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331(a).

Based on undisputed facts, both parties have filed competing motions for summary judgment (dockets #10 & #12). For the reasons set forth below, summary judgment should be granted in favor of Braeden on the First Claim and in favor of CSD on the Second Claim.

### STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. FRCP 56(a). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). On a motion for summary judgment, the court "draws all justifiable inferences in favor of the non-moving party." *Fresno Motors, LLC v. Mercedes Benz USA, LLC,* 771 F.3d 1119, 1125 (9th Cir.2014), citing

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### *UNDISPUTED FACTS*

On April 12, 2012, Braeden, who was then a 14–year–old eighth-grade student at Colton Middle School ("CMS"), learned that he had received a "C" from his health teacher, Veronica Bouck. B. Burge Decl. (docket # 12), ¶¶ 1–2, 5; Patton Decl. (docket # 13), Ex. 1 ("B. Burge Depo."), p. 27. This upset Braeden who is normally an "A" student. B. Burge Depo., p. 29; Patton Decl., Ex. 2 ("K. Burge Depo."), p. 25. Because of the low grade, Braeden's mother grounded him for a portion of the summer. K. Burge Depo., pp. 31–32.

To vent his frustration, Braeden posted a series of comments on his private Facebook page from his own home on a day that school was not in session. B. Burge Depo., pp. 26–29. He posted that he wanted to "start a petition to get mrs. Bouck fired, she's the worst teacher ever." Mersereau Decl. (docket # 11), Ex. 1, p. 1. After a friend asked "what did [ms. Bouck] do?" Braeden responded "She's just a bitch haha." *Id.* Then his friend wrote "XD HAHAHAHA!!" and Braeden stated "Ya haha she needs to be shot." *Id.* Braeden did not intend to threaten or otherwise communicate with Bouck and did not seriously believe that Bouck should be shot. B. Burge Decl. ¶¶ 4–5; B. Burge Depo., pp. 33–34. Braeden was not even serious about starting a petition to get Bouck fired. B. Burge Depo., p. 30. His only purpose in posting these comments was "to elicit a response from [his] friends, just to see what they thought about it." *Id.*, p. 29.

Only those Facebook users whom Braeden had confirmed as "friends" would have been able to view the comments he posted on his Facebook wall. *Id.*, p. 13; B. Burge Decl. ¶ 3.[1] Braeden is not and has never been Facebook friends with Bouck and did not intend for Bouck to see his comments about her. B. Burge Decl. ¶ 4. When Braeden made the Facebook comments about Bouck, he was not Facebook friends with any CMS or CSD employee or staff member. *Id.*; Patton Decl., Ex. 5 ("Powell Depo."), p. 45 & Ex. 19. Because CMS blocks Facebook access at school, students cannot access Facebook on school computers. Powell Depo., pp. 82–83.

Braeden's mother monitors each of her children's Facebook pages on a daily basis because she is Facebook friends with each of them. K. Burge Depo., p. 24. She saw Braeden's comments about Bouck on Facebook less than 24 hours after he posted them. B. Burge Depo., pp. 32–33. She immediately instructed Braeden to delete the entire post, which he did. *Id.*, pp. 33, 38; K. Burge Depo., pp. 29–31.

No one heard or said anything about Braeden's April 12, 2012 Facebook comments until May 29, 2012. K. Burge Depo., p. 33; B. Burge Depo., pp. 34, 40, 42, 53; Powell Depo., p. 63. On that day, over six weeks after Braeden had made the post and taken it down, the parent of another CMS student anonymously placed a printout of Braeden's Facebook post in the school mailbox of CMS's principal, Kara Powell. Powell Depo., pp. 16–19. After receiving the printout, Powell had Braeden brought to the school office where she questioned him. *Id.*, pp. 2223. Braeden acknowledged that he made the Facebook comments. *Id.*, p. 23; B. Burge, p. 43. Neither Powell nor the CSD Superintendent, Linda Johnson, investigated whether Braeden had access to or experience with guns, contacted the police, or referred him to a counselor. Powell

---

1. A Facebook "friend" is a Facebook user that has been allowed access to see another user's Facebook account. B. Burge Depo., p. 13.

Depo., pp. 29, 39–41, 71–72; Patton Decl., Ex. 4 ("Johnson Depo."), pp. 7–8. Instead, Powell showed some CSD policies to Braeden and gave him a three and one-half day in-school suspension. Powell Depo., pp. 23–25, 30–31; Patton Decl., Ex. 8.

After deciding to discipline Braeden, Powell called Braeden's parents. K. Burge Depo., pp. 33–35; Powell Depo., pp. 29–31. Ms. Burge informed Powell that she was aware of the post, and that she had already talked to Braeden about it. K. Burge Depo., p. 35. Ms. Burge also disagreed with the suspension and stated that the school could not discipline one of her children for misconduct that occurred outside of school. *Id.*, pp. 37–38. Powell suspended Braeden despite Ms. Burge's opposition. *Id.*, p. 35.

Braeden did not have a significant history of disciplinary issues. Johnson Depo., pp. 8, 19. According to Powell, Braeden was "respectful ... and compliant." Powell Depo., p. 15. Braeden had never been disciplined before by CMS or CSD for any act of violence and had never been convicted of a juvenile crime of any kind. B. Burge Depo., pp. 8–9, 18. Powell did not discuss the Facebook posts with any of Braeden's other teachers and did not investigate whether Braeden had made similar Facebook posts after April 12. Powell Depo., pp. 55–56, 69. Bouck did not take off any time from work as a result of Braeden's Facebook posts and did not discuss the Facebook posts with Braeden or any other students or teachers at CMS. Patton Decl., Ex. 6 ("Bouck Depo."), pp. 22, 25.

After the half-day in-school suspension, Ms. Burge decided to pull Braeden out of school for the remaining three days of his suspension. K. Burge Depo., p. 45. Braeden returned to classes on June 4, 2012, and completed the last week of eighth grade without incident. B. Burge Depo., pp. 50–51; Bouck Depo., pp. 25, 27. John-

son did not keep Braeden out of Bouck's classroom the last three days of school which, after initial protest, Bouck accepted. Johnson Depo., pp. 21–22. Braeden also attended a class field trip supervised by Bouck on June 8, 2012, which was the last day of school before the summer recess. Patton Decl., Ex. 3 ("Bjarnson Depo."), pp. 15–16. Unbeknownst to Braeden, he was followed that day by an educational assistant, Kellene Bjarnson. *Id.* According to Bjarnson, there were no disciplinary problems involving Braeden on the field trip. *Id.*, pp. 15, 18.

### *FINDINGS*

### I. *Monell Liability*

■ CSD first seeks summary judgment against both § 1983 claims because it cannot be liable for violating Braeden's constitutional rights pursuant to *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In *Monell*, the Supreme Court held that a municipality may only be liable under § 1983 for a constitutional tort in three general ways. First, a plaintiff can prove that the employee who deprived him of a constitutional right was acting pursuant to a formal or *de facto* municipal policy or entrenched custom. *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir.1992). Second, the plaintiff can prove that the person was an official with "final policymaking authority" and the "challenged action itself thus constituted an act of official governmental policy." *Id.* Third, a plaintiff can prove that an official with final policymaking authority "ratified" a municipal employee's unconstitutional act. *Id.* at 1346–47.

CSD's motion interprets Braeden's allegations as asserting § 1983 claims under *Monell* based on a ratification theory. However, Braeden has clarified that his § 1983 claims are premised on the theory

"that a district employee was acting pursuant to an expressly adopted official policy." *Lytle v. Carl,* 382 F.3d 978, 982 (9th Cir. 2004). When CSD officials suspended Braeden, they were acting pursuant to official school district policies, namely Policies JFCM and JFCM–AR (Threats of Violence), GBNA and GBNA–AR (concerning bullying and intimidation of staff), JG (Student Discipline), and JGD (Suspension), as well as the section of the CMS Student Handbook entitled "Actions Against Other Persons." Patton Decl., ¶ 25; Ex. 10, p. 1 & Exs. 24–25; Powell Depo., pp. 23–25, 27–28; Johnson Depo., p. 5; Suppl. Patton Decl. (docket # 22), Ex. 1, p. 22. If Braeden's suspension was issued pursuant to official policies, then CSD is liable for any violation of his constitutional rights as a result of that suspension.

CSD responds that Braeden has no § 1983 claim because Powell merely identified some CSD policies which she believed supported, but did not mandate, Braeden's suspension. In the context of his due process claim, Braeden argues that CSD did not give him sufficient notice that he could be disciplined for his off-campus conduct. CSD believes that Braeden cannot have it both ways. If CSD has a policy that its employees cannot discipline students for off-campus conduct, then CSD should not be liable for the acts of its employees contrary to that policy. Because Braeden has established only that Powell had the discretion to act in a certain way and did so, CSD contends that her discretionary suspension cannot be considered the act of CSD.

However, "*Monell* requires only that the official policy cause the constitutional violation, not that the policy itself be unconstitutional." *McKinley v. City of Eloy,* 705 F.2d 1110, 1117 (9th Cir.1983); *Obert v. The Pyramid,* 381 F.Supp.2d 723, 727 (W.D.Tenn.2005), citing *City of Canton*

*v. Harris,* 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) ("[A] municipality may be liable if an employee's application of an otherwise constitutional policy leads to an unconstitutional result."); *Ramirez v. City of Phoenix,* No. 2:12–cv–00639, 2013 WL 3833061, at *2–3 (D.Ariz. 2013) (complaint satisfied *Monell* where plaintiff alleged that a city official used a valid city policy "to issue the reprimand in contravention of Ramirez's free speech rights"). In other words, even if the policy is constitutional, a municipal entity may be held liable for its unconstitutional application by its employee. Granting discretion to the employee does not automatically immunize the municipal entity from a § 1983 claim.

Therefore, CSD's motion for summary judgment based on *Monell* should be denied.

## II. *First Amendment (First Claim)*

The First Claim alleges that CSD violated Braeden's First Amendment rights to free expression when they punished him for statements he made while in the privacy of his own home and not participating in any school-sponsored activity. CSD seeks summary judgment on this claim for several reasons. First, it argues that Braeden's speech is not protected by the First Amendment because it falls within the "true threat" exception. Second, CSD may regulate student speech created off-campus if it presents an actual or potential, "material and substantial" disruption of the school environment which, according to CSD, Braeden's speech did. Braeden, in turn, seeks summary judgment for the opposite reasons.

### A. *True Threat*

The Supreme Court has recognized a narrow "true threat" exception to the First Amendment. *Virginia v. Black,* 538 U.S.

343, 359, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003). Accordingly, if Braeden's Facebook comments constitute a "true threat," then they receive no First Amendment protection, regardless of where they were made.

 Not every off-hand reference to violence is a true threat unprotected by the First Amendment. " 'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Black,* 538 U.S. at 359, 123 S.Ct. 1536. The Ninth Circuit has made it clear that "speech may be deemed unprotected by the First Amendment as a 'true threat' only upon proof that the speaker subjectively intended the speech as a threat." *Fogel v. Collins,* 531 F.3d 824, 831 (9th Cir.2008), quoting *United States v. Cassel,* 408 F.3d 622, 633 (9th Cir.2005). In addition to the subjective test, an objective test may be applicable in determining if speech is a true threat:

> Because the true threat requirement is imposed by the Constitution, the subjective test set forth in *Black* must be read into all threat statutes that criminalize pure speech. The difference is that with respect to some threat statutes, we require that the purported threat meet an objective standard *in addition,* and for some we do not.

*United States v. Bagdasarian,* 652 F.3d 1113, 1117 (9th Cir.2011).

 CSD argues that only the objective test applies in the civil context, citing *Wynar v. Douglas Cnty. Sch. Dist.,* 728 F.3d 1062 (9th Cir.2013). However, *Wynar* did not decide whether the statements at issue were true threats or whether only the objective standard applies in cases where the government imposes a civil sanction on an individual based on threatening speech. Furthermore, applying only the objective test is contrary to imposing the subjective standard as the *minimal* standard applicable whenever the government punishes threatening speech. *Bagdasarian,* 652 F.3d at 1117. Accordingly, if only one standard applies in the civil context, it is the subjective standard. The additional objective test may also apply, depending on the statute or policy under which the speaker has been punished. *Id.* Under either test, Braeden's speech was not a "true threat."

### 1. *Subjective Standard*

The subjective requirement of the "true threat" exception to the First Amendment is met "only if the 'speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals.' It is therefore not sufficient that objective observers would reasonably perceive such speech as a threat of injury or death." *Id.* at 1116, quoting *Black,* 538 U.S. at 359, 123 S.Ct. 1536. Thus, "the constitutional inquiry commanded by *Black*" is this: "Did the speaker subjectively intend the speech as a threat?" *Id.* at 1118.

It is undisputed that when Braeden posted his comments Facebook, he did not intend to threaten or intimidate Bouck or any other person. B. Burge Decl., ¶¶ 4–5; B. Burge Depo., pp. 27, 29, 33–34. Indeed, he did not believe Bouck would ever see the comments because he has never been Facebook friends with her. B. Burge Decl., ¶ 4. He intended only to express his dissatisfaction with his grade and elicit a response from his friends and not to even communicate with Bouck. *Id.,* ¶¶ 4–5. For solely this reason, Braeden's Facebook comments were not "true threats" within the exception to the First Amendment.

### 2. *Objective Standard*

The objective test asks whether "a reasonable person would foresee that the statement would be interpreted by those to whom he communicates the statement as a serious expression of intent to harm or assault." *Fogel*, 531 F.3d at 831. This test requires the fact-finder to " 'look[ ] at the entire factual context of [the] statements including: the surrounding events, the listeners' reaction, and whether the words are conditional.' " *Bagdasarian*, 652 F.3d at 1119, quoting *United States v. Gordon*, 974 F.2d 1110, 1117 (9th Cir.1992) (alterations in original).

The anticipated reaction of the intended audience is a key element. When Braeden posted his comments, his Facebook page was set to "friends only." His Facebook friends were other young people or his family, and not any CMS or CSD employee or staff member. Thus, the issue is whether a reasonable person in Braeden's position would foresee that the other teenagers with whom he was Facebook friends would interpret his comments about Bouck as a serious expression of intent to harm or assault. *See, e.g., Bagdasarian*, 652 F.3d at 1119. Given the comments responding to his post, the answer is clearly no. *See Watts v. United States*, 394 U.S. 705, 706, 708, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969) (Laughter in response to comments by 18–year–old war protester at a public rally that "If they ever make me carry a rifle the first man I want to get in my sights is L.B.J," was a "very crude offensive method of stating a political opposition to the President."). Braeden initiated the conversation by wishing Bouck would be fired because "she's the worst teacher ever." Mersereau Decl., Ex. 1. His friends responded with laughter ("hahahaha") and contradictory opinions about her teaching. *Id.* Braeden's comments, while crude ("She's just a bitch"), were meant and understood by his audience as a

critique of Bouck's teaching skills and not the serious expression of intent to harm her.

The reactions of Johnson and Powell demonstrate that even they anticipated no violence from Braeden based on his Facebook comments. They did not investigate whether Braeden had access to guns or a history of violence, contact the police or a mental health professional, or even remove Braeden from Bouck's classroom. Furthermore, the minor sanction that Johnson imposed demonstrates that she was not at all concerned with Braeden returning to CMS. No evidence supports the conclusion that school officials honestly believed that Braeden's Facebook comments made six weeks earlier were a "serious expression of intent to harm or assault." Although an anonymous parent may have been concerned, Braeden's mother viewed the Facebook post as typical teenage communication. K. Burge Depo., p. 45; K. Burge Decl. (docket # 15), ¶ 3. In any event, only the anticipated reaction of Braeden's Facebook friends, the intended audience, is relevant under the objective test, not the reaction of the school officials or other parents.

Another key element of the objective test is whether the words themselves constitute a threat within the ordinary meaning of that word. *Bagdasarian*, 652 F.3d at 1119–20. In *Bagdasarian*, the defendant made some disturbing comments in an Internet chatroom about then-presidential candidate Barack Obama. He was convicted under 18 U.S.C. § 879(a) which makes it a crime to threaten to kill a major presidential candidate. Applying the objective test, the Ninth Circuit held that Bagdasarian's comments did not constitute "a threat in the ordinary meaning of the word: 'an expression of an intention to inflict * * * injury * * * on another.' "

*Id.,* quoting Webster's Third New Int'l Dictionary 2382 (1976). It explained:

> The "Obama fk the niggar" statement is a prediction that Obama "will have a 50 cal in the head soon." It conveys no explicit or implicit threat on the part of Bagdasarian that he himself will kill or injure Obama. Nor does the second statement impart a threat. "[S]hoot the nig" is instead an imperative intended to encourage others to take violent action, if not simply an expression of rage or frustration.... It is difficult to see how a rational trier of fact could reasonably have found that either statement, on its face or taken in context, expresses a threat against Obama by Bagdasarian.

*Id.*

Braeden's Facebook comments are tamer and similarly do not constitute a threat within the ordinary meaning of the word. He did not threaten to shoot Bouck himself, but at most stated "an imperative intended to encourage others to take violent action, if not simply an expression of rage or frustration." *Id.* Thus, Braeden's Facebook comments were not "true threats" under the objective test.

## B. *Off-campus Student Speech*

■ Even if not a "true threat," CSD argues that disciplining Braeden for his Facebook comments did not violate the First Amendment. Public school students are protected by the First Amendment and do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.,* 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). However, schools may restrict speech that "might reasonably [lead] school authorities to forecast substantial disruption of or material interference with school activities" or that collides "with the rights of other students to be secure and to be let alone." *Id.* at 508, 514, 89 S.Ct. 733. Since *Tinker,*

the Supreme Court has decided three cases governing a different area of student speech: (1) vulgar, lewd, obscene, and plainly offensive speech occurring on school grounds is governed by *Bethel Sch. Dist. No. 403 v. Fraser,* 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986); (2) "school-sponsored speech" is governed by *Hazelwood Sch. Dist. v. Kuhlmeier,* 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988); and (3) the "somewhat unique" category of speech promoting illegal drug use is governed by *Morse v. Frederick,* 551 U.S. 393, 127 S.Ct. 2618, 168 L.Ed.2d 290 (2007). "Beyond those contexts, the Court has noted only that '[t]here is some uncertainty at the outer boundaries as to when courts should apply school speech precedents.'" *Wynar,* 728 F.3d at 1067, quoting *Morse,* 551 U.S. at 401, 127 S.Ct. 2618.

The Supreme Court has not yet addressed whether *Tinker* governs off-campus speech by students, but other courts have, including the Ninth Circuit in two cases. However, neither of those cases involves the situation presented here.

In *LaVine v. Blaine Sch. Dist.,* 257 F.3d 981 (9th Cir.2001), a student was temporarily expelled because he wrote a first-person poem at home about a school shooting and suicide that he later showed to his English teacher during class. The Ninth Circuit applied *Tinker* and found that the school could have reasonably "forecast substantial disruption of or material interference with school activities—specifically, that [the student] was intending to inflict injury upon himself or others." *Id.* at 990. In contrast, Braeden never intended his comments to be brought to the school and actively took steps to decrease the likelihood that his post would find its way to the school. He set his Facebook privacy settings so that only his Facebook friends could see the comments. He also deleted

the Facebook post less than 24 hours after writing it.

More recently in *Wynar,* the Ninth Circuit addressed an "off-campus communication among students involving a safety threat to the school environment and brought to the school's attention by a fellow student, not the speaker." 728 F.3d at 1068. Landon, a high school student, "engaged in a string of increasingly violent and threatening instant messages sent from home to his friends bragging about his weapons, threatening to shoot specific classmates, intimating that he would 'take out' other people at a school shooting on a specific date, and invoking the image of the Virginia Tech massacre." *Id.* at 1064–65. After his friends notified school authorities, the student was temporarily expelled. The Ninth Circuit concluded that "the location of the speech can make a difference, but that does not mean that all off-campus speech is beyond the reach of school officials." *Id.* at 1068. It explained:

A number of our sister circuits have wrestled with the question of *Tinker's* reach beyond the schoolyard. The Second, Fourth and Eighth Circuits have concluded that *Tinker* applies to certain off-campus speech. These Circuits have imposed some additional threshold test before applying *Tinker* to speech that originates off campus. For example, the Fourth Circuit requires that the speech have a sufficient "nexus" to the school, while the Eighth Circuit requires that it be "reasonably foreseeable that [the speech] will reach the school community." ... [A]t least where it is reasonably foreseeable that off-campus speech meeting the *Tinker* test will wind up at school, the Second Circuit has permitted schools to impose discipline based on the speech.

The Third and Fifth Circuits have left open the question whether *Tinker* applies to off-campus speech....

*Id.* at 1068–69 (citations omitted).

Based on the "myriad of circumstances involving off-campus speech," the Ninth Circuit was "reluctant to try and craft a one-size fits all approach." *Id.* at 1069. Instead, it side-stepped the issue by finding no "need to decide whether to incorporate or adopt the threshold tests from our sister circuits, as any of these tests could be easily satisfied." *Id.* It affirmed summary judgment for the school district on the First Amendment claim, explaining:

Given the subject and addresses of Landon's messages, it is hard to imagine how their nexus to the school could have been more direct; for the same reasons, it should have been reasonably foreseeable to Landon that his messages would reach campus. Indeed, the alarming nature of the messages prompted Landon's friends to do exactly what we would hope any responsible student would do: report to school authorities. Here we make explicit what was implicit in *LaVine:* when faced with an identifiable threat of school violence, schools may take disciplinary action in response to off-campus speech that meets the requirements of *Tinker.*

*Id.*

Under *Wynar,* if Braeden's off-campus comments constitute "an identifiable threat of school violence" and would substantially disrupt or materially interfere with school activities, then CSD could discipline him without violating the First Amendment. The Ninth Circuit did not explain in *Wynar* what constitutes "an identifiable threat of school violence." As discussed above, Braeden's comments do not rise to the level of a "true threat" that receives no First Amendment protection. However, the Ninth Circuit appears to allow school

authorities the ability to discipline off-campus comments that pose less of a threat as long as they could substantially disrupt or materially interfere with school activities. Thus, the issue is whether CSD could reasonably conclude that Braeden's Facebook comments "would *'materially and substantially* interfere with the requirements of appropriate discipline in the operation of the school.'" *Tinker,* 393 U.S. at 509, 89 S.Ct. 733 (emphasis added), quoting *Burnside v. Byars,* 363 F.2d 744, 749 (5th Cir. 1966).

Although an actual disruption is not required, school officials must have more than an "undifferentiated fear or apprehension of disturbance" to overcome the student's right to freedom of expression. *Id.* at 508, 89 S.Ct. 733. Other courts have interpreted that the "material and substantial disruption" test from "*'Tinker* requires a specific and significant fear of disruption, not just some remote apprehension of disturbance.'" *T.V. ex rel. B.V. v. Smith–Green Comm. Sch. Corp.,* 807 F.Supp.2d 767, 782 (N.D.Ind.2011), quoting *Saxe v. State Coll. Area Sch. Dist.,* 240 F.3d 200, 211 (3rd Cir.2001). Relevant factors include "whether school administrators are pulled away from their ordinary tasks to respond to or mitigate the effects of a student's speech." *J.C. v. Beverly Hills Unified Sch. Dist.,* 711 F.Supp.2d 1094, 1113–14 (C.D.Cal.2010). Even where "students are discussing the speech at issue," no substantial disruption exists, "at least [when] there is no evidence that classroom activities were substantially disrupted." *Id.* at 1111 (citation omitted). In addition, student speech cannot be punished "on the basis of ... embarrassment to school officials," *Burch v. Barker,* 861 F.2d 1149, 1159 (9th Cir.1988), and "it is certainly not enough that the speech is merely offensive to some listener." *Saxe,* 240 F.3d at 217.

There is no evidence that Braeden's Facebook post had any impact on classroom activities. It did not cause a widespread whispering campaign at CSM and was not discussed by students at school or anywhere else. B. Burge Depo., pp. 34, 40–47, 53; Bjarnson Depo., p. 17; Johnson Depo., p. 25; Powell Depo., p. 63. When Braeden returned to classes after his suspension, there were no incidents or discussions concerning the Facebook post. In fact, he continued to attend Bouck's class unsupervised and without incident. B. Burge Depo., pp. 49–50; Bjarnson Depo., p. 15. No students missed class and no CSD employees, including Bouck, missed work because of Braeden's Facebook post. Johnson Depo., pp. 23–24; Bouck Depo., p. 22.

No school administrators were pulled away from their ordinary tasks in order to respond to Braeden's Facebook post. Powell spent approximately one hour dealing with Braeden after learning of his Facebook post. Powell Depo., pp. 48–49, 67–68. All of that time was spent on tasks that are part of her regular duties as a middle school principal. *Id.,* pp. 7, 49, 68–69. The day that Bjarnson, the educational assistant, spent shadowing Braeden was part of her ordinary duties. Bjarnson Depo., pp. 8, 11–15. Finally, Johnson spent just a few hours in total dealing with Braeden's Facebook post. Johnson Depo., p. 22. This does not constitute a "material and substantial" disruption. *See J.C.,* 711 F.Supp.2d at 1117 ("address[ing] the concerns of an upset parent and a student who temporarily refused to go to class," as well as causing five students to miss an undetermined portion of one school day did not rise to the level of a substantial disruption); *see also T.V.,* 807 F.Supp.2d at 785 ("[T]his case involved two complaints from parents and some petty sniping among a group of 15 and 16 year olds. This can't be what the Supreme Court had

in mind when it enunciated the 'substantial disruption' standard in *Tinker*. To find otherwise would be to read the word 'substantial' out of 'substantial disruption.' "); *Killion v. Franklin Reg. Sch. Dist.*, 136 F.Supp.2d 446 (W.D.Pa.2001) (granting summary judgment to plaintiff on First Amendment claim where two teachers were upset by plaintiff's rude top-ten list which had been on school grounds for nearly a week without any disruption before the discipline was imposed).

Of course, school authorities need not wait until an actual disruption of the school environment occurs. "*Tinker* does not require certainty that disruption will occur, but rather the existence of facts which might reasonably lead school officials to forecast substantial disruption." *LaVine*, 257 F.3d at 989 (internal quotations marks and citation omitted). However, regulation of student speech must be "based on *evidence* or *facts* indicating a foreseeable risk of disruption, rather than undifferentiated fears or mere disapproval of the speech." *J.C.*, 711 F.Supp.2d at 1115. In other words, if "a school can point to a well-founded expectation of disruption—especially one based on past incidents arising out of similar speech—the restriction may pass constitutional muster." *Saxe*, 240 F.3d at 212.

In *LaVine*, the Ninth Circuit found that the school district reasonably forecast substantial disruption where: (a) the student showed a teacher a violent poem he had written that explicitly described a mass shooting of his classmates and his own suicide; (b) the student had previously discussed his suicidal tendencies with the school counselor; (c) the school was aware that he had been involved in a domestic dispute with his father and had to leave his family home; (d) the school also knew that the student had recently broken up with his girlfriend and had been accused of stalking her; and (e) the student had a prior discipline record at the school, including one act of violence. *LaVine*, 257 F.3d at 984, 989–90. Calling this "*a close case in retrospect,*" the court ultimately found that, based on these facts, school officials could reasonably portend substantial disruption and possible violence. *Id.* at 983 (emphasis added).

In *Wynar*, Landon's friends were alarmed at his "increasingly violent and threatening instant messages" about his weapons and threatening to shoot specific classmates and others on a specific date and notified school authorities. *Wynar*, 728 F.3d at 1064–65. When questioned by the police, Landon confirmed that he had access to weapons and ammunition at his house. *Id.* at 1071. On these facts, the Ninth Circuit found that it "was reasonable for Douglas County to interpret the messages as a real risk and to forecast a substantial disruption." *Id.* at 1070.

The facts in *LaVine* or *Wynar* are easily distinguishable from the facts here. Braeden's Facebook comments were not explicitly violent and graphic. Unlike the student in *LaVine*, Braeden has no history of being violent, having emotional problems, or having any serious disciplinary problems while at CMS. Also, Braeden had never fired a gun and had no access to guns or ammunition. B. Burge Depo., p. 34.

Of even greater significance, during the six week period before Powell became aware of Braeden's Facebook comments, no one talked about or otherwise acknowledged them. Braeden continued to attend Bouck's health class and had no disciplinary issues. Even when Powell learned of them, her conduct evidenced no fear of future substantial disruption or violence. She did not ask him or his parents if he had access to guns, did not contact the police or have him evaluated by a mental health professional. Instead, she imposed

a sanction that required Braeden to sit for the entire school day in an area in the school office near the teachers' mailboxes. *See Evans v. Bayer*, 684 F.Supp.2d 1365, 1376 (S.D.Fla.2010) (noting that the requirements of *Tinker* were not met where the student's offending Facebook page had already been taken down by the time it was brought to the school principal's attention, such that "the potential spark of disruption had sputtered out, and all that remained was the opportunity to punish.").

In the absence of evidence that Braeden had committed acts of violence in the past, had access to guns, or had any serious discipline problems, no reasonable factfinder could conclude that Braeden's Facebook comments were reasonably likely to cause the type of future substantial disruption required by *Tinker*. Thus, even if *Tinker* applies to Braeden's off-campus speech, CSD violated Braeden's First Amendment free speech rights when it suspended him. Braeden therefore should be granted summary judgment on his First Claim.

### III. *Fourteenth Amendment (Second Claim)*

Braeden's Second Claim under § 1983 alleges a denial of his due process rights under the Fourteenth Amendment. He seeks summary judgment on this claim because he did not receive fair warning that he could be disciplined for constitutionally-protected comments he posted to Facebook from the privacy of his own home, outside school hours, and while not participating in any school-sponsored activity. CSD, in turn, seeks summary judgment because Braeden was not deprived of any property interest and was not denied any due process.

#### A. *Property Interest*

■ The Fourteenth Amendment forbids the State from depriving "any person of life, liberty, or property, without due process of law." Braeden argues that by failing to give him adequate warning prior to his suspension, CSD deprived him of his property right in educational benefits. A student's right to a public education is a property interest protected by the Due Process Clause. *Goss v. Lopez*, 419 U.S. 565, 576, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). Accordingly, a student who has been removed from public school for more than a *de minimis* period can bring a due process claim under § 1983. *Id.*

> The Court's view has been that as long as a property deprivation is not *de minimis*, its gravity is irrelevant to the question whether account must be taken of the Due Process Clause. A 10–day suspension from school is not *de minimis* in our view and may not be imposed in complete disregard of the Due Process Clause.
>
> A short suspension is, of course, a far milder deprivation than expulsion. But ... the total exclusion from the educational process for more than a trivial period, and certainly if the suspension is for 10 days, is a serious event in the life of the suspended child.

*Id.* (citations omitted).

■ CSD contends that Braeden's three and a half day in-school suspension was not functionally equivalent to an out-of-school suspension. Braeden served one-half day of his suspension in school before his mother pulled him out of school to serve the balance. During that time, he sat in an office next to Powell's office under adult supervision. B. Burge Depo., p. 46; Powell Depo., p. 42. One of his teachers brought him his weeks' school assignments to work on, and other teachers were available to assist him with his work. B. Burge Depo., pp. 45–46, 48; Powell Depo., pp. 42–43. According to the Handbook, a student serving an in-school suspension:

must report to the office at the assigned time with class work to do. In-school suspension is a "silent" area; students are allowed one bathroom break in the morning and one in the afternoon. Lunch is eaten in the "ISS" area; office staff will send student to get his/her lunch prior to other students' lunch times.

Suppl. Patton Decl., Ex. 1, p. 19.

Since Braeden was given schoolwork to do, CSD argues that he was not excluded from the educational process to the extent required to implicate a due process property interest. Neither the Ninth Circuit nor this court has addressed whether or when an in-school suspension amounts to "total exclusion from the educational process for more than a trivial period" as required by *Goss*. However, CSD finds support for its position in *Laney v. Farley*, 501 F.3d 577 (6th Cir.2007), which held that a one-day, in-school suspension did not deprive the plaintiff of a property interest. The Sixth Circuit recognized that "[u]nder certain circumstances, in-school isolation could well constitute as much deprivation of education as at-home suspension ... it would depend on the extent to which the student was deprived of instruction or the opportunity to learn." *Id.* at 581–82, quoting *Cole v. Newton Special Mun. Separate Sch. Dist.*, 676 F.Supp. 749, 751–51 (S.D.Miss.1987), *aff'd*, 853 F.2d 924 (5th Cir.1988) (concluding that the facts were insufficient to make that determination). Under Tennessee law, "students assigned to in-school suspension remain in the school setting and are expressly 'required to complete academic requirements'" and, thus, are "not denied all educational opportunities, even though they are removed from their classrooms." *Id.* at 582 (citation omitted). The Sixth Circuit agreed with the views of three other courts that "have reached the sensible conclusion that in-school suspensions do not implicate a student's property interest in a

public education." *Id.*, citing *Wise v. Pea Ridge Sch. Dist.*, 855 F.2d 560, 563 n. 3 (8th Cir.1988) (holding that three-day in-school suspension in a special classroom "does not exclude the student from school and consequently a student's property interest in a public education is not implicated"); *Fenton v. Stear*, 423 F.Supp. 767, 771–72 (W.D.Pa.1976) (holding no deprivation of a property interest for a three-day in-school suspension where the student was not deprived of any in-school education); *Dickens v. Johnson Cnty. Bd. of Educ.*, 661 F.Supp. 155, 159 (E.D.Tenn. 1987) (holding that no property interest was implicated for a "timeout" in a three-sided carton for up to four and a half hours on six consecutive days.).

Other courts have also declined to find a property interest based on similar punishments. *Jones v. Long Cnty. Sch. Dist.*, 2012 WL 3562300, at *5 (S.D.Ga. Aug. 14, 2012) (two-day in-school suspension was not counted as total exclusion from the education process); *Couture v. Bd. of Ed. of Albuquerque Pub. Sch.*, 535 F.3d 1243, 1257–58 (10th Cir.2008) (missing 12 hours of class through punishment time-outs is not equivalent to a denial of education). Braeden has cited, and this court has found, no cases to the contrary.

Although Braeden was removed from the classroom, even he concedes that an in-school suspension was preferable to a suspension at home. He had an algebra final exam either that week or the next week and did not get enough time to study. B. Burge Depo., p. 49. Had he remained suspended in school next to Powell's office and not stayed at home, he felt he would have had more time to study and received a higher grade. *Id.*, pp. 49, 52. Although this court can conceive of circumstances when an in-school suspension may deprive a student of the property interest he has in his education, this case does not present

those circumstances. Because CSD did not deprive Braeden of any property interest, he does not state a claim under § 1983 for a due process violation. Thus, CSD should be granted summary judgment against the Second Claim.[2]

### B. Denial of Due Process

In the alternative, even if the short in-school suspension deprived Braeden of a property interest, CSD argues that Braeden received all the procedural due process to which he was entitled. For suspensions of 10 days or less, procedural due process requires "that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story. The Clause requires at least these rudimentary precautions against unfair or mistaken findings of misconduct and arbitrary exclusion from school." *Goss*, 419 U.S. 565, 581, 95 S.Ct. 729. This means "only that, in being given an opportunity to explain his version of the facts at this discussion, the student first be told what he is accused of doing and what the basis of the accusation is." *Id.* at 582, 95 S.Ct. 729. These notice and hearing requirements are characterized as "an informal give-and-take between student and disciplinarian, preferably prior to the suspension." *Id.* at 584, 95 S.Ct. 729. *Goss* remains the guiding decision for public school suspensions of ten days or less. *See e.g., Smith on Behalf of Smith v. Severn*, 129 F.3d 419, 428–29 (7th Cir.1997) (affirming three-day suspension where minimal due process rights described in *Goss* were met); *C.B. By and Through Breeding v. Driscoll*, 82 F.3d 383, 388 (11th Cir.1996) (affirming two nine-day

suspensions where "rudimentary" requirements of *Goss* were met).

Braeden was notified of what he had done and what policies he had violated and offered the opportunity to explain his misconduct. However, he contends that he was not given "fair notice" that he could be suspended for his off-campus Facebook comments.

Since CSD is entitled to summary judgment against the Second Claim because Braeden was not deprived of any property interest, this court need not decide this alternative issue.

### RECOMMENDATIONS

For the reasons stated above, Defendant's Motion for Summary Judgment (docket # 10) should be granted against the Second Claim and denied against the First Claim, and Plaintiff's Cross Motion for Summary Judgment (docket # 12) should be granted against the First Claim and denied against the Second Claim. Accordingly, the court should enter a judgment in favor of plaintiff declaring that defendant's conduct and policies violated plaintiff's First Amendment rights to free speech, directing defendant to remove plaintiff's suspension from his school records and awarding plaintiff his reasonable attorney fees, costs and disbursements pursuant to 42 U.S.C. § 1988.

### SCHEDULING ORDER

These Findings and Recommendations will be referred to a district judge. Objections, if any, are due Friday, March 20, 2015. If no objections are filed, then the Findings and Recommendations will go under advisement on that date.

---

2. For the same reason, CSD argues, without citing any authority, that Braeden cannot state any § 1983 claim for the denial of his free speech under the First Amendment. However, the First Amendment, unlike the Fourteenth Amendment, does not require the deprivation of an interest in "life, liberty or property."

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendations will go under advisement.

DATED March 3, 2015.